6 F.3d 735
 UNITED STATES of America, Plaintiff-Appellant,
v.
Larry Joe CARROLL, Defendant-Appellee;
UNITED STATES of America, Plaintiff-Appellant, Cross-Appellee,
v.
Thomas SPIKER, Dorlis Spiker, Larry Joe Carroll, Michael
Spiker, Defendants-Appellees, Cross-Appellants,
Larry Jessee, Defendant-Appellant.
 Nos. 91-3079, 91-3188.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 9, 1993.
 
 John H. Bothwell, III, Tampa, FL, for Dorlis Spiker.
 Jack T. Edmund, Ft. Meade, FL, for Thomas Spiker.
 Nestor Castillo, Jr., Tampa, FL, for Larry Joe Carroll.
 Phillip E. Kuhn, Lakeland, FL, for Michael Spiker.
 Shawn A. Burklin, Clearwater, FL, for Larry Jesse.
 Tamra Phipps, Edmund W. Searby, James C. Preston, Asst. U.S. Attys., Tampa, FL, for U.S.
 Appeals from the United States District Court for the Middle District of Florida.
 Before TJOFLAT, Chief Judge, CARNES, Circuit Judge, and BRIGHT*, Senior Circuit Judge.
 CARNES, Circuit Judge:
 
 
 1
 This case involves convictions arising out of a conspiracy to manufacture and possess with intent to distribute methamphetamine. A jury convicted the defendants on various counts of a multicount indictment. The Government has appealed from the district court's entry of a judgment of acquittal on the conspiracy conviction of one defendant and the court's imposition of sentence for all the defendants, and the defendants have cross-appealed their convictions and sentences.[1] Of the many issues raised in the appeal and cross-appeals, we find that only three, all sentencing issues, warrant discussion. For reasons we will explain, we reverse the district court's decision to credit Dorlis Spiker, Michael Spiker, and Thomas Spiker with reductions for acceptance of responsibility; we affirm the court's determination of the drug quantity involved in this conspiracy for purposes of sentencing; and we reverse the court's determination that "Pure Methamphetamine" as used in the Sentencing Guidelines refers only to D-methamphetamine. In all other respects, the convictions and sentences are due to be affirmed.
 
 I. BACKGROUND
 
 2
 In November 1989, representatives of the Eastman Kodak Company ("Kodak") notified the Drug Enforcement Agency ("DEA") that Kodak had received a suspicious order for chemicals from a company called "All American Labs" in Winter Haven, Florida. An investigation revealed that there was no such company at the address listed on the purchase order presented to Kodak; rather, at that location was a store called "Spiker's All American 4X4," which sold automotive parts and accessories. Michael Spiker, Larry Jessee, and Larry Joe Carroll all worked at the store, Spiker as manager.
 
 
 3
 The DEA began an investigation of "Spiker's All American 4X4," which included surveillance of the store and of three different deliveries of chemicals by Kodak to "All American Labs" at the address of "Spiker's All American 4X4" from November 1989 to May 1990. These orders were placed under a false name, using purchase order forms from "Spiker's All American 4X4" that had been altered to read "All American Labs." The chemicals ordered by the bogus "All American Labs" included phenylacetic acid, acetic anhydride, and sodium acetate, which when properly combined create phenylacetone, or "P-2-P," a Schedule II controlled substance and an immediate precursor to methamphetamine. See 21 C.F.R. Sec. 1308.12(g)(1)(i). The DEA's investigation and surveillance of the defendants included court-ordered electronic tracking devices placed in the drums of chemicals delivered by Kodak, and both still and video photography. At trial, the Government introduced photographic evidence of Michael Spiker, Larry Joe Carroll, and Larry Jessee unloading and loading the chemicals. The altered purchase orders instructed that deliveries were to be made to the attention of "Michael/Larry." The Government introduced evidence to show that these chemicals were not part of the retail business conducted by "Spiker's All American 4X4," were not typical of the deliveries received at the store, and once received were placed in a storage shed at the rear of the store which was not used for store inventory. In addition, the Government's evidence showed that Thomas Spiker, who was not an employee of the store at the time, was allowed to remove the chemicals from the store soon after their delivery. Furthermore, the evidence established that Thomas Spiker and Dorlis Spiker recruited John Booth to be their "cook," or "chemist," and to help them in the manufacture of methamphetamine with the chemicals that had been ordered and delivered.[2] Booth helped Thomas Spiker determine which chemicals to order and in what quantities to order them. Booth set up a clandestine laboratory in a trailer in a remote area and, using the chemicals provided by Thomas Spiker, produced approximately 31 grams of DL-methamphetamine.
 
 
 4
 On May 24, 1990, Thomas and Dorlis Spiker were followed by DEA agents to Booth's home, where Booth delivered to them approximately 28 grams of the methamphetamine he had produced. Thomas and Dorlis Spiker were arrested upon leaving Booth's home, and the methamphetamine was found in Dorlis's purse. Booth was arrested in his home later that evening, and a search of his home, pursuant to a warrant, led to the seizure of several drums of chemicals, including one in which the DEA had placed a tracking device prior to its delivery by Kodak. The following day, the DEA searched a mobile home where Thomas Spiker had previously stored the chemicals and recovered business cards printed with "All American Labs" and the "Spiker's All American 4X4" address; copies of purchase order forms sent to Kodak; a laboratory products catalog with Thomas Spiker's handwriting on the front; and a list of chemicals needed for the manufacture of methamphetamine written by John Booth.
 
 
 5
 The DEA's investigation led to a seven-count indictment charging the defendants and others who are not parties to this appeal with conspiring to manufacture and possess with intent to distribute 100 grams or more of methamphetamine in violation of 21 U.S.C. Secs. 841(a)(1) and 846, and other crimes.[3]
 
 II. DISCUSSION
 
 6
 A. Reduction for Acceptance of Responsibility
 
 
 7
 The Government has appealed the district court's action at sentencing in crediting Thomas Spiker, Michael Spiker, and Dorlis Spiker each with a reduction of their offense levels for acceptance of responsibility under U.S.S.G. Sec. 3E1.1(a). That Guidelines section provides that a defendant who "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct" may receive a two-level decrease in his offense level. U.S.S.G. Sec. 3E1.1(a) (November 1, 1990).[4] We review the district court's determination under Sec. 3E1.1(a) for clear error. United States v. Query, 928 F.2d 383, 386 (11th Cir.1991). We have stated numerous times that "[t]he district court is in a unique position to evaluate whether a defendant has accepted responsibility for his acts, and this determination is entitled to great deference on review." United States v. Pritchett, 908 F.2d 816, 824 (11th Cir.1990). Nonetheless, in this case we conclude that the district court's determination that these defendants had clearly demonstrated acceptance of responsibility for their crimes is without foundation and, therefore, must be reversed. SeeUnited States v. Marin, 916 F.2d 1536, 1538 (11th Cir.1990) (district court's Sec. 3E1.1 determination not disturbed unless without foundation).
 
 
 8
 1. The Reductions for Thomas and Michael Spiker
 
 
 9
 At sentencing, the district court explained its two-point acceptance of responsibility reductions for both Thomas Spiker and Michael Spiker in the same way, stating:
 
 
 10
 [A]lthough defendant has exercised his Fifth Amendment rights to not incriminate himself, he has otherwise co-operated fully at all phases of the trial and sentencing process, including meeting all conditions of pre-trial release and voluntarily surrendering to the U.S. Marshal as ordered. Defendant has never denied his participation in this offense other than through his entry of the Not Guilty plea and this Court is of the opinion that to penalize him for failure to waive his Fifth Amendment rights would result in a denial of fundamental constitutional rights.
 
 
 11
 The Government objected to the reductions for Thomas and Michael Spiker in the district court and argues on appeal that the court's action was "tantamount to rewarding them for not disrupting court proceedings." We agree. The relevant Sentencing Guidelines commentary provides that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. Sec. 3E1.1, comment. (n. 2). In this case, Thomas and Michael Spiker never admitted guilt nor expressed any remorse for their offenses, and the district court's reliance on concerns for their Fifth Amendment rights for its award of Sec. 3E1.1 reductions was clear error.
 
 
 12
 In United States v. Henry, 883 F.2d 1010, 1011 (11th Cir.1989), this Court held that conditioning sentence reductions on a defendant's acceptance of responsibility does not violate the Fifth Amendment merely because such reductions likely will be unavailable to defendants who choose to exercise their Fifth Amendment rights. Henry appealed his sentence contending that because he had chosen to testify to his innocence at trial, in order to receive a lower sentence, he was faced with the necessity of having to build a perjury case against himself by confessing at the sentencing hearing to that which he had denied under oath at trial. Henry argued that "because a defendant, believing in his innocence but fearing conviction, might reasonably forego taking the stand to take advantage of the acceptance of responsibility provision without subjecting himself to a perjury charge[,] ... [Sec. 3E1.1] chills the right of a defendant to defend himself." Henry, 883 F.2d at 1011. This Court rejected Henry's argument:
 
 
 13
 Section 3E1.1 may well affect how criminal defendants choose to exercise their constitutional rights. But "not every burden on the exercise of a constitutional right and not every encouragement to waive such a right is invalid." Corbitt v. New Jersey, 439 U.S. 212, 219, 99 S.Ct. 492, 493-497, 58 L.Ed.2d 466 (1978). Persons involved in the criminal law process are faced with a variety of choices. Some of the alternatives may lead to unpleasant consequences. For example, to choose to go to trial may result in greater punishment.... Section 3E1.1 may add to the dilemmas facing criminal defendants, but no good reason exists to believe that 3E1.1 was intended to punish anyone for exercising rights. We are unprepared to equate the possibility of leniency with impermissible punishment.
 
 
 14
 Id. (footnotes omitted). But seeUnited States v. Frierson, 945 F.2d 650, 659-60 (3d Cir.1991) (holding that denial of reduction for acceptance of responsibility was a "penalty" which could not be imposed for defendant's assertion of Fifth Amendment privilege), cert. denied, --- U.S. ----, 112 S.Ct. 1515, 117 L.Ed.2d 651 (1992).
 
 
 15
 As with the defendant's decision to testify in Henry, Thomas and Michael Spiker's decisions to exercise their Fifth Amendment rights and not testify would not be unconstitutionally burdened by a refusal to award them leniency at sentencing for acceptance of responsibility. Section 3E1.1(a) is not a punishment; rather, the reduction for acceptance of responsibility is a reward for those defendants who express genuine remorse for their criminal conduct. E.g.,Henry, 883 F.2d at 1011-12 & n. 6. It was clear error for the district court in this case to grant the Sec. 3E1.1 reduction based on the conclusion that to refuse would be to "penalize" the defendants for exercising their rights not to testify.
 
 
 16
 The other factors enumerated by the district court as support for its action also fail to demonstrate these two defendants' acceptance of responsibility. A defendant must do more than sit quietly and take his medicine. Section 3E1.1 is intended to reward those defendants who affirmatively acknowledge their crimes and express genuine remorse for the harm caused by their actions. United States v. Scroggins, 880 F.2d 1204, 1215 (11th Cir.1989), cert. denied, 494 U.S. 1083, 110 S.Ct. 1816, 108 L.Ed.2d 946 (1990). The district court cited no evidence that Thomas and Michael Spiker did, in fact, accept responsibility for their crimes. When given the opportunity at oral argument, counsel for the defendants could point this Court to no such evidence. Under these circumstances, it was clear error for the district court to grant Thomas and Michael Spiker two-point reductions for acceptance of responsibility under Sec. 3E1.1(a).
 
 2. The Reduction for Dorlis Spiker
 
 17
 Dorlis Spiker was convicted on Count One of conspiring to manufacture and possess with intent to distribute 100 grams or more of methamphetamine and on Count Three of possession with intent to distribute 100 grams or more of methamphetamine. At sentencing, the district court awarded Dorlis Spiker a one-level reduction of her offense level for acceptance of responsibility, explaining, "The Court finds this defendant clearly demonstrated a recognition and affirmative acceptance of personal responsibility as to the criminal conduct charged in Count 3 and therefore is entitled to a 1 point reduction." In a Solomonic attempt to split the baby, the court apparently gave Dorlis Spiker "half credit" under Sec. 3E1.1(a), because through counsel she admitted to one of the elements of one of the two crimes with which she was charged, i.e., she admitted to a lesser included offense to one of the charges.
 
 
 18
 In closing argument, Dorlis Spiker's counsel conceded that she had been in possession of methamphetamine and that she had a drug use problem, arguing that she was a truck driver and that everyone knows truck drivers frequently use methamphetamine. However, neither Dorlis Spiker nor her counsel ever conceded the other elements of the higher charges she faced, which were conspiracy to manufacture and intent to distribute methamphetamine. Because there is no provision in the Guidelines for such a one-point reduction for acceptance of responsibility, and because the facts in this case did not support any adjustment for acceptance of responsibility, we reverse.
 
 
 19
 This Circuit has never decided whether Sec. 3E1.1 authorizes less than a two-level reduction for a "partial" acceptance of responsibility. Because this is an issue of Guidelines interpretation, we review de novo the district court's decision to grant a one-level reduction for Dorlis Spiker's partial acceptance of responsibility. United States v. Worthy, 915 F.2d 1514, 1516 (11th Cir.1990). We are persuaded by the plain language of Sec. 3E1.1 to follow the Fifth Circuit's decision in United States v. Valencia, 957 F.2d 153 (5th Cir.1992), and hold that Sec. 3E1.1 does not provide for such a reduction. In Valencia, the district court expressly found that the defendant had partially accepted responsibility and, therefore, was entitled to a one-point reduction, rather than the two-point reduction provided for in Sec. 3E1.1(a). The Fifth Circuit reversed, holding that "U.S.S.G. Sec. 3E1.1 does not contemplate either a defendant's mere partial acceptance of responsibility or a district court's being halfway convinced that a defendant accepted responsibility." Id. at 156; see alsoUnited States v. Farrier, 948 F.2d 1125, 1127 (9th Cir.1991) (holding that the Guidelines do not provide for an acceptance of responsibility reduction other than by two levels, therefore, reversing four-level reduction). We agree with the Fifth Circuit's reasoning and, therefore, hold that the district court's decision to grant Dorlis Spiker a one-level reduction for acceptance of responsibility was based on an erroneous interpretation of the Guidelines. Dorlis Spiker was entitled to either a two-level reduction or none, and the burden was on her clearly to demonstrate an acceptance of responsibility for her criminal conduct in order to justify a two-level reduction. SeeUnited States v. Paslay, 971 F.2d 667, 675 (11th Cir.1992) (burden of proof under Sec. 3E1.1 on defendant). If the facts of this case were such that the district court could properly award Dorlis Spiker a two-level reduction for acceptance of responsibility, we would remand to allow the court to decide whether to do so. Because we decide that it would be error to grant such a reduction, however, we decline to remand the matter for further consideration.
 
 
 20
 In United States v. Jones, 899 F.2d 1097, 1101 (11th Cir.), cert. denied, 498 U.S. 906, 111 S.Ct. 275, 112 L.Ed.2d 230 (1990), and overruled on other grounds,United States v. Morrill, 984 F.2d 1136 (11th Cir.1993), this Court upheld as not clearly erroneous a district court's conclusion that the defendant's acknowledgment of a lesser-included offense was a "trial tactic" and did not amount to acceptance of responsibility under Sec. 3E1.1. In this case, the issue is whether a tactical admission of guilt to a lesser-included offense could ever be sufficient, standing alone, to warrant a two-level reduction for acceptance of responsibility. We begin our analysis of this question by acknowledging that a defendant who elects to go to trial does not, thereby, necessarily forfeit entitlement to a Sec. 3E1.1 reduction. As the Guidelines commentary says, "Conviction by trial ... does not automatically preclude a defendant from consideration for such a reduction." U.S.S.G. Sec. 3E1.1, comment. (n. 2). The commentary goes on to point out, however, the infrequent nature of circumstances where the reduction might still be available after a defendant has elected to put the government to its proof:
 
 
 21
 In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.
 
 
 22
 Id. No such rare circumstances were present in this case. While counsel for Dorlis Spiker acknowledged Dorlis's guilt for the lesser-included offense of simple possession of methamphetamine, Dorlis did not accept responsibility for the more serious crimes of which she was charged and convicted: conspiracy to manufacture and possess with intent to distribute, and possession with intent to distribute.
 
 
 23
 We find persuasive the reasoning of the Fourth Circuit in United States v. Gordon, 895 F.2d 932 (4th Cir.), cert. denied, 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990), which involved facts somewhat similar to this case. Gordon was convicted after a jury trial of possession with intent to distribute cocaine. At sentencing, Gordon admitted that he was guilty of simple possession and requested a reduction for acceptance of responsibility under Sec. 3E1.1. The district court denied Gordon's request and he appealed, arguing that forcing him to admit an intent to distribute in order to receive the reduction required him to sacrifice his right to preserve his appeal in exchange for a reduction in sentence. Noting the district court's finding that Gordon had done nothing else to indicate his acceptance of responsibility, the Fourth Circuit stated, "Indeed, Gordon's claim that he was entitled to this mitigating factor while at the same time denying the criminal conduct for which he was convicted by a jury borders on the frivolous." Gordon, 895 F.2d at 937. Dorlis Spiker's claim is not frivolous, but it is without merit. Absent some other factual foundation to support the finding that Dorlis Spiker demonstrated acceptance of responsibility for her crimes of conviction, the district court's reliance for its Sec. 3E1.1(a) reduction on a tactical confession of guilt to a lesser-included offense was clear error.
 
 
 24
 B. The Sentencing Court's Finding with Respect to Drug Quantity and Purity
 
 1. The Drug Quantity for Sentencing
 
 25
 The defendants challenge the district court's determination of the drug quantity for purposes of sentencing, alleging that the court failed to set out sufficiently the factual findings on which its determination was based. "This court reviews the trial court's determination of the quantity of drugs used to establish a base offense level for sentencing purposes under the clearly erroneous standard." United States v. Robinson, 935 F.2d 201, 205 (11th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 885, 116 L.Ed.2d 789 (1992). We conclude that the district court did not clearly err in its drug quantity calculation, and that its finding should be affirmed.
 
 
 26
 Because only a small amount of methamphetamine was actually seized in this case, the district court considered, consistent with the Guidelines, evidence offered at sentencing to establish the amount of methamphetamine that could have been produced by the defendants' conspiracy. The relevant Guidelines commentary provides:
 
 
 27
 Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the sentencing judge shall approximate the quantity of the controlled substance. In making this determination, the judge may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.
 
 
 28
 U.S.S.G. Sec. 2D1.4, comment. (n. 2) (November 1, 1990) (emphasis added).[5]
 
 
 29
 The district court heard testimony from two expert witnesses, Dr. Terrence Owen for the defense and DEA chemist Harold Hanel for the Government. Owen testified that based on an estimated yield of 60%, 1.5 kilograms of methamphetamine could have been produced from the chemicals seized in this case, but that the process used by the conspirator's chemist, John Booth, would likely have produced only 150 grams. Hanel testified that 150 grams was a yield of only 1.5%-2% and that based on a 100% theoretical (and admittedly unattainable) yield, 6.1 kilograms could have been produced from the least abundant chemical precursor in Booth's clandestine lab, and 19.1 kilograms from the most abundant chemical. Based on all of the chemicals actually ordered, Hanel testified that a minimum of 18 kilograms and a maximum of 72.5 kilograms could be produced. Hanel also testified, however, that 50%-75% was a more realistic yield, which would reduce his estimates by as much as one-half. In light of this evidence, the district court concluded as follows:
 
 
 30
 The Court finds as a result of hearing the testimony of the expert chemical witnesses the quantity of methamphetamine which could have been produced in the lab using all chemicals known to have been received during the course of this conspiracy is 1.8 kilograms.
 
 
 31
 Thus, the district court was presented with a range of estimates based on the chemicals received during the course of the conspiracy. At the low end were Dr. Owen's estimates of 150 grams producible using John Booth's methods or 1.5 kilograms using a more productive method, and at the high end were DEA chemist Hanel's estimates of 19.1 kilograms at 100% yield and 9.55 kilograms at 50% yield. The court placed the amount of methamphetamine for purposes of sentencing at 1.8 kilograms. The court properly used expert testimony about the chemicals acquired for use in the conspirators' clandestine lab to approximate the conspiracy's capacity for production of methamphetamine. United States v. Hyde, 977 F.2d 1436, 1440 (11th Cir.1992) (applying rule of approximation in context of offense of possession of listed chemicals for production of controlled substance), cert. denied, --- U.S. ----, 113 S.Ct. 1948, 123 L.Ed.2d 653 (1993). There being no clear error, we affirm the district court's finding with respect to the quantity of methamphetamine producible by this conspiracy.
 
 
 32
 2. Finding that "Pure Methamphetamine" Under the Guidelines
 
 
 33
 Referred Only to "D-methamphetamine"
 
 
 34
 The Government contends that the district court erred when it declined to find that the quantity of methamphetamine intended for production by the conspiracy was "Pure Methamphetamine" as used in Guidelines Sec. 2D1.1(c). Under Sec. 2D1.1(c), the base offense level for a quantity of "Pure Methamphetamine" is higher than that for an equal amount of "Methamphetamine" and, thus, will yield a higher sentence. "Because the interpretation of the United States Sentencing Guidelines is similar to statutory interpretation, the district court's reading of the Guidelines is subject to de novo review on appeal." United States v. Worthy, 915 F.2d 1514, 1516 (11th Cir.1990). We conclude that the district court's decision was based on an erroneous interpretation of the Sentencing Guidelines and that its finding that the substance in this case could not be considered "Pure Methamphetamine" should be reversed. In reaching our decision, we first discuss the facts established at sentencing relating to the controlled substance the defendants sought to produce. We then examine Guidelines Sec. 2D1.1 and its commentary in light of those facts. Finally, we draw on the decisions of other courts interpreting analogous language in 21 U.S.C. Sec. 841, as well as recent clarifying amendments to Sec. 2D1.1 and its commentary.
 
 
 35
 The experts who testified in this case agreed that there are three different methamphetamine forms: L-methamphetamine, which was described as an inert form with little or no physiological effects; D-methamphetamine, which has the active physiological effects characteristic of this drug; and DL-methamphetamine, which is composed of 50% L-methamphetamine and 50% D-methamphetamine. The conspiracy at issue in this case involved the manufacture of DL-methamphetamine. The district court determined, however, that "pure methamphetamine as used in the Drug Quantity Table refers to D-methamphetamine and thus ha[d] no application in this case." The district court apparently based its decision about the meaning of "Pure Methamphetamine" on the distinction between the inert L-methamphetamine and the more physiologically active D-methamphetamine, concluding that the more active form was "pure." We find that the district court erred in its conclusion that "Pure Methamphetamine" refers only to D-methamphetamine, a conclusion not supported by the Guidelines.
 
 
 36
 The Drug Quantity Table, U.S.S.G. Sec. 2D1.1(c),[6] establishes base offense levels for drug trafficking offenses using a graduated scale that increases the offense level for each incremental increase in the quantity of drugs involved. An explanatory footnote to Sec. 2D1.1(c) provides, "In the case of a mixture or substance containing PCP or methamphetamine, use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the pure PCP or methamphetamine, whichever is greater." U.S.S.G. Sec. 2D1.1(c), n.* (November 1, 1990).[7] Thus, unlike other controlled substances listed in Sec. 2D1.1(c), methamphetamine and PCP are to be quantified for sentencing using either the weight of a mixture or substance containing the drug, or the weight of the pure drug itself, whichever yields the greater offense level. The mixture to purity ratio at each level of the Drug Quantity Table is ten to one; therefore, it takes one-tenth the quantity of pure methamphetamine to yield the same offense level as a mixture or substance containing methamphetamine. See generallyUnited States v. Brown, 921 F.2d 785, 789 & n. 2 (8th Cir.1990) (discussing Drug Quantity Table's approach to methamphetamine).
 
 
 37
 We have never before addressed the Guidelines' use of "Pure Methamphetamine," but based on our reading of Sec. 2D1.1 and its commentary, as well as the drug trafficking offense statute at 21 U.S.C. Sec. 841, we hold that the distinction between methamphetamine and pure methamphetamine refers to the relative purity of any methamphetamine compound; it does not refer to a particular form of methamphetamine. As discussed above, the Drug Quantity Table in the Guidelines themselves distinguishes between "Methamphetamine" and "Pure Methamphetamine," but does not distinguish between any chemical forms of methamphetamine. Only in the commentary to Sec. 2D1.1 do we find any reference to different chemical forms of methamphetamine. The commentary's Drug Equivalency Tables do distinguish "L-methamphetamine" from "Methamphetamine" and "Methamphetamine (pure)". For example, 1 gram of methamphetamine and 1 gram of methamphetamine (pure) equal 5 and 50 grams of cocaine, respectively, but 1 gram of L-methamphetamine equals only 0.2 grams of cocaine. U.S.S.G. Sec. 2D1.1, comment. (n. 10) (November 1, 1990).[8] The lesser equivalency of the L-form in the commentary is consistent with the expert testimony in this case establishing that L-methamphetamine has far fewer physiological effects. At the time of sentencing in this case, the Guidelines made no further distinctions with respect to the various chemical forms of methamphetamine.
 
 
 38
 We recently addressed the less severe sentences under the Guidelines for the L- form of methamphetamine in United States v. Patrick, 983 F.2d 206, 208 (11th Cir.1993), where the defendant appealed his sentence claiming that the district court should have determined his offense level based on the less potent L-methamphetamine. Because the Government's evidence established only that the drug involved was "methamphetamine" and did not specify which form, we reversed Patrick's sentence and remanded for a determination by the district court of the specific form of methamphetamine. Id. at 209-10. However, in Patrick we did not decide the definition of "Pure Methamphetamine" as that term is used in the Guidelines. And while our decision appears to have assumed that if the methamphetamine at issue there was not L-methamphetamine, it was D-methamphetamine, that assumption was not necessary to the Court's disposition of Patrick's appeal. The district court in Patrick did not specify which form of the drug was at issue: L-, D-, or DL-. Patrick claimed it was L-, and the Government claimed it was D-. We remanded for a factfinding by the district court on the form of methamphetamine actually involved. If Patrick's contention was correct, he should have received a lower sentence based on the lower potency of L-methamphetamine as established by the Drug Equivalency Table and, therefore, the sentencing court could not simply assume the drug involved was the form that would yield the harsher sentence. Id. at 209. Because Patrick did not decide any issue related to purity or to the definition of "Pure Methamphetamine," however, that decision is not dispositive of this case.
 
 
 39
 Based on the express provisions of Sec. 2D1.1, there is no support for the district court's determination that "Pure Methamphetamine" means only D-methamphetamine. The commentary to Sec. 2D1.1 states that "[a]ny reference to a particular controlled substance in these guidelines includes all salts, isomers, and all salts of isomers." Id. Sec. 2D1.1, comment. (n. 5). Except to the extent a particular molecular form of methamphetamine is treated separately by the Guidelines, then, we must read references to "Methamphetamine" as encompassing all forms of that substance. Moreover, the Sentencing Commission demonstrated that it knew how to distinguish the chemical forms of methamphetamine when it singled out L-methamphetamine for different treatment in the equivalency tables. SeeUnited States v. Koonce, 991 F.2d 693, 698 (11th Cir.1993) (relying on the well-established principle of statutory construction that the inclusion of one implies the exclusion of others to interpret Guidelines).
 
 
 40
 The expert testimony at sentencing in this case established that the form of methamphetamine that could be produced with the chemicals obtained by the defendants and the methods used in Booth's clandestine lab was DL-methamphetamine, not D-methamphetamine and not L-methamphetamine. The Government's expert stated that the distinction between D-methamphetamine and DL-methamphetamine did not involve issues of purity as the district court's finding in this case suggests; rather, DL-methamphetamine was simply a combination of methamphetamine's "enantiomers," the D- and L- forms. Enantiomers are like the right and left hand forms of the same compound. Thus, D-methamphetamine, rather than representing the "pure" form of methamphetamine, is merely one form of that chemical compound. It follows that 100% D-methamphetamine, like 100% DL-methamphetamine, would constitute 100% "Pure Methamphetamine" for purposes of sentencing under Guidelines Sec. 2D1.1. (It is only because the Commission chose to distinguish L-methamphetamine from "Methamphetamine" and "Pure Methamphetamine" that 100% L-methamphetamine would not likewise constitute 100% "Pure Methamphetamine.")
 
 
 41
 While we find no case authority defining "Pure Methamphetamine" as used in the Guidelines, analogous cases dealing with the drug trafficking statute's mandatory minimum sentence provisions support our conclusion that the adjective "pure" is intended only to mean the relative purity of the methamphetamine compound itself, in whichever form. In fact, these cases rely in part for their holdings on the same Guidelines Commentary that supports our decision. In United States v. Stoner, 927 F.2d 45 (1st Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 129, 116 L.Ed.2d 96 (1991), the defendant challenged the district court's imposition of a minimum mandatory 5-year sentence for conspiracy and distribution of methamphetamine. The district court sentenced Stoner under 21 U.S.C. Sec. 841(b)(1)(B)(viii), which provides for a mandatory 5-year minimum sentence for offenses involving "10 grams or more of methamphetamine ... or 100 grams or more of a mixture or substance containing a detectable amount of methamphetamine." (emphasis added). Stoner argued that the statute's use of the word "or" to distinguish between methamphetamine and mixtures containing methamphetamine meant that the sentencing court could not remove the actual amount of methamphetamine from the mixture and sentence on the basis of the percentage of the mixture that was methamphetamine. Stoner, 927 F.2d at 46. In other words, Stoner argued that because he had a mixture and not pure methamphetamine, he could only be subject to the mandatory sentence if he possessed more than 100 grams, regardless of the purity or concentration of methamphetamine in that mixture. The First Circuit rejected that argument, holding that the mandatory penalty could be triggered by either the net quantity of pure methamphetamine or the gross quantity of a mixture or substance containing any detectable amount of methamphetamine. Id.
 
 
 42
 Relying in part on Stoner, the Fourth Circuit rejected a similar argument involving application of the mandatory sentencing provisions to the defendants in United States v. Rusher, 966 F.2d 868 (4th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992). In Rusher, the court also found support in the Guidelines, drawing a direct parallel between the alternative sentencing routes in the mandatory sentencing provisions of Sec. 841 and the similar net purity or gross quantity alternatives for determining base offense levels for methamphetamine and PCP as explained in the footnote to the Drug Quantity Table. Rusher, 966 F.2d at 880 (quoting U.S.S.G. Sec. 2D1.1(c), n. *). The Rusher defendants claimed that the 5-year mandatory minimum sentence provisions of the drug trafficking statute distinguished between "pure" methamphetamine and a mixture containing methamphetamine in such a way that, absent 100% purity in the drugs, the sentencing court could only sentence based on the 100 gram threshold for mixtures. Thus, because the defendants possessed only 72 grams of a "mixture" containing methamphetamine at between 86% and 91% purity, the district court had erred when it imposed the 5-year minimum. The Fourth Circuit rejected that argument and affirmed the district court's imposition of the minimum sentence concluding, "The only way to conduct this analysis is to multiply the purity of the drug times its quantity to obtain the amount of pure methamphetamine." Id.; see alsoUnited States v. Alfeche, 942 F.2d 697, 698-99 (9th Cir.1991) (relying on Guidelines' treatment of PCP and methamphetamine to hold 10-year minimum sentencing provision of Sec. 841 applies to offenses involving either a net amount of 100 grams of methamphetamine or 1000 grams of a mixture containing methamphetamine). Likewise, we conclude that the only way to calculate the quantity of "Pure Methamphetamine" in determining a defendant's base offense level under Sec. 2D1.1(c) is to multiple the purity of the mixture or substance times the weight of the mixture or substance.
 
 
 43
 A subsequent clarifying amendment to Sec. 2D1.1 confirms the correctness of our reading of the Guidelines. That amendment replaced "Pure Methamphetamine" with "Methamphetamine (actual)" and added the following explanation: "The term[ ] 'Methamphetamine (actual)' refer[s] to the weight of the controlled substance, itself, contained in the mixture or substance. For example, a mixture weighing 10 grams containing [Methamphetamine] at 50% purity contains 5 grams of [Methamphetamine (actual) ]." U.S.S.G. App. C, amend. 395 (November 1, 1991). While this clarification was not available to the district court, it supports our reading of the language of Sec. 2D1.1(c) in effect at the time of sentencing. In addition, further amendments effective November 1, 1991, included an addition to the footnote after Sec. 2D1.1(c) that defined the term "Ice" as a mixture or substance containing D-methamphetamine. U.S.S.G. App. C, amend. 370. This, the Guidelines' first express reference to the D- form of methamphetamine, offers additional support for our conclusion that, when the Sentencing Commission intends to distinguish D-methamphetamine from "Methamphetamine" or "Pure Methamphetamine," it can and will do so expressly. We have held previously that clarifying amendments to the Guidelines' commentary
 
 
 44
 constitute strongly persuasive evidence of how the Sentencing Commission originally envisioned that the courts would apply the affected guideline [and, thus,] ... courts should consider such clarifying amendments to the guidelines' commentary in interpreting the guidelines, even with regard to offenders convicted of offenses occurring before the effective date of the amendments.
 
 
 45
 United States v. Scroggins, 880 F.2d 1204, 1215 (11th Cir.1989).[9] For all of these reasons, we conclude that the district court misinterpreted the Guidelines when it refused to consider for sentencing purposes the percentage of "Pure Methamphetamine" that would be present in the 1.8 kilograms of DL-methamphetamine it found could be produced by the conspiracy.
 
 III. CONCLUSION
 
 46
 Michael Spiker, Thomas Spiker, and Dorlis Spiker were not entitled to reductions for acceptance of responsibility. The district court correctly determined the quantity of methamphetamine the conspiracy could produce, but the court erred in not considering the purity of that substance at sentencing.
 
 
 47
 Therefore, we REVERSE the sentences of Michael Spiker, Thomas Spiker, Dorlis Spiker, and Larry Jessee, and REMAND for resentencing in accordance with this opinion. The judgments of the district court are in all other respects AFFIRMED.
 
 
 48
 BRIGHT, Senior Circuit Judge, concurring in part and dissenting in part:
 
 I.
 
 49
 I concur in the convictions, but would remand for resentencing of the Spikers (Dorlis, Michael and Thomas). I would affirm the other sentences imposed by the district court. In remanding the sentences of the Spikers, I would permit the district court to adjust the sentences.
 
 
 50
 In my view, the sentencing court retains sentencing prerogatives on the reversals of sentences and here should be afforded the opportunity to evaluate whether a proper basis exists for sentence reduction based on acceptance of responsibility pursuant to U.S.S.G. Sec. 3E1.1. Even if the Spikers were not entitled to a reduction, resentencing would be necessary so that the district court could decide whether to consider or disregard what it might characterize as "partial acceptance of responsibility" in determining where in the guideline range to fix defendants' sentences. United States v. Valencia, 957 F.2d 153, 156 n. 4 (5th Cir.1992).
 
 II.
 
 51
 I dissent from the majority's reversal striking down the district court's resolution of the drug quality issue. The district court concluded that the methamphetamine intended for production was "methamphetamine" and not "pure methamphetamine" for sentencing purposes under Sec. 2D1.1(c). As will become apparent if it has not already, the majority embarks upon a journey through troubled waters emanating from complexities in the Guidelines.
 
 A. Background
 
 52
 There are six forms of methamphetamine referred to in this case: methamphetamine, pure methamphetamine, D-methamphetamine, L-methamphetamine, levo-methamphetamine, and DL-methamphetamine. As discussed below, L-methamphetamine and levo-methamphetamine are sometimes lumped together and referred to as L-methamphetamine/levo-methamphetamine.
 
 
 53
 The 1990 Guidelines applied by the district court make two distinctions concerning methamphetamine: (1) between methamphetamine and pure methamphetamine, and (2) between methamphetamine, pure methamphetamine and L-methamphetamine/levo-methamphetamine.
 
 
 54
 The first distinction--between methamphetamine and pure methamphetamine--is found in the Drug Quantity Table of U.S.S.G. Sec. 2D1.1(c) (1990) at pp. 2.42-.47. The table assigns a ten times higher relative offense level to pure methamphetamine (one gram of methamphetamine equals five grams of cocaine; one gram of pure methamphetamine equals fifty grams of cocaine). The asterisk-designated note at the end of the table states that when calculating the offense level for methamphetamine, apply the greater of the level determined by: (1) the entire weight of the mixture or substance containing the methamphetamine, or (2) the entire weight of the pure methamphetamine.
 
 
 55
 The second distinction--between methamphetamine, pure methamphetamine and L-methamphetamine/levo-methamphetamine--is found in the Drug Equivalency Tables of U.S.S.G. Sec. 2D1.1 at pp. 2.49-.52. This table also assigns a ten times higher relative offense level to pure methamphetamine when compared to methamphetamine, but adds a 250 times higher relative offense level to pure methamphetamine when compared to L-methamphetamine/levo-methamphetamine (one gram of L-methamphetamine/levo-methamphetamine equals .2 grams of cocaine; one gram of pure methamphetamine equals fifty grams of cocaine).
 
 
 56
 Thus, there are three types of methamphetamine identified for purposes of calculating a defendant's base offense level under the 1990 Guidelines: methamphetamine, pure methamphetamine, and L-methamphetamine/levo-methamphetamine.
 
 B. The Record in this Case
 
 57
 A problem arose at sentencing because the defendants in this case were convicted of crimes involving DL-methamphetamine, which is not one of the three forms of methamphetamine identified in the 1990 Guidelines. In an attempt to resolve the problem, the district court considered two factors: the subsequent 1991 revisions to the Guidelines and expert testimony.
 
 
 58
 The Commission made two relevant changes in the November 1991 amendments to the Sentencing Guidelines. The first is in the Drug Quantity Table in Sec. 2D1.1(c) at pp. 76-82 (1991), where "Pure Methamphetamine" is changed to "Methamphetamine (actual)." The official commentary concerning this change provides, in relevant part:
 
 
 59
 'The terms "PCP (actual)" and "Methamphetamine (actual)" refer to the weight of the controlled substance, itself, contained in the mixture or substance. For example, a mixture weighing 10 grams containing PCP at 50% purity contains 5 grams of PCP (actual).'
 
 
 60
 ....
 
 
 61
 This amendment clarifies the operation of the guideline in cases involving methamphetamine or PCP by replacing the terms 'Pure PCP' and 'pure methamphetamine' with 'PCP (actual)' and 'methamphetamine (actual),' and by providing an example of their application.
 
 
 62
 U.S.S.G. App. C. p 395 (1991).
 
 
 63
 The second change is the addition of a new drug called "ice" to the Drug Quantity Table in Sec. 2D1.1(c) at pp. 76-82 (1991). For purposes of establishing a base offense level, "ice" is treated the same as methamphetamine (actual). The asterisk-designated note at the end of the table (p. 82) includes the following definition:
 
 
 64
 'Ice,' for the purposes of this guideline, means a mixture or substance containing d-methamphetamine hydrochloride of at least 80% purity.
 
 
 65
 U.S.S.G. Sec. 2D1.1(c) asterisk-designated note at p. 82 (1991).
 
 
 66
 Both the Government and the defendants had chemists provide expert testimony at trial: Harold Hanel for the Government, and Dr. Owens for the defendants. Both stated that DL-methamphetamine consists of 50% D-methamphetamine and 50% L-methamphetamine, of which the D-methamphetamine is the only physiological active ingredient and the L-methamphetamine is inactive. Owens testified that DL-methamphetamine is not the purest form of the drug, and that the purer D-methamphetamine could be purified from the L-methamphetamine part of the DL-methamphetamine to produce a more potent form of methamphetamine. Owens also testified that D-methamphetamine is processed from a completely different primary chemical, ephedrine, and involves a completely different manufacturing process.
 
 
 67
 Each expert testified that DL-methamphetamine has one-half the potency and effect of D-methamphetamine. Owens conceded that in pharmaceutical "parlance" D- and DL- are used interchangeably, but argued this is inaccurate because the two are different. Hanel conceded that the DEA distinguishes between D-, DL- and L- in its substance reports.
 
 
 68
 Apparently, the Government's report merely identified the substances confiscated in this case as "methamphetamine," and Hanel could not determine from the report whether the methamphetamine was D- or DL-. Owens stated that polarimeter readings are necessary to make this determination and that Booth (defendants' cook) did not use the required equipment in his process.
 
 
 69
 From this information--the 1991 Guidelines amendments and the testimony of Owens and Hanel--the district court concluded that the type of drug involved in the crimes was "methamphetamine," not "pure methamphetamine."
 
 C. Discussion
 
 70
 The majority states that "the distinction between methamphetamine and pure methamphetamine refers to the relative purity of any methamphetamine compound; it does not refer to a particular form of methamphetamine." Maj. op. at 744-45. Then, in contravention of the expert testimony elicited, the majority concludes that
 
 
 71
 D-methamphetamine, rather than representing the 'pure' form of methamphetamine, is merely one form of that chemical compound. It follows that 100% D-methamphetamine, like 100% DL-methamphetamine, would constitute 100% 'Pure Methamphetamine' for purposes of sentencing under Guidelines Sec. 2D1.1. (It is only because the Commission chose to distinguish L-methamphetamine from 'Methamphetamine' and 'Pure Methamphetamine' that 100% L-methamphetamine would not likewise constitute 100% 'Pure Methamphetamine.')
 
 
 72
 Maj. op. at 745.
 
 D. Additional Comments
 
 73
 Not surprisingly the reader is now experiencing great confusion due to the convoluted chemical rhetoric in the minority and majority opinions. In another case, this writer said:
 
 
 74
 Now, if the reader is confused by the complexity of a correct application of the guidelines in this case, that confusion is understandable. The guideline system of sentencing has become exceedingly opaque. We judges do the best we can to interpret the increasingly bulky, almost incomprehensible code of the guidelines. Nevertheless, without an overhaul of the entire guideline system, it is nearly impossible to sentence offenders in a straightforward and equitable manner. One commentator characterized the federal guidelines as an "incredibly insane, complicated system." Cris Carmody, Sentencing Overload Hits the Circuits, Nat'l L.J., Apr. 5, 1993, at 32, (quoting Judy Clarke, Executive Director, Federal Defenders of Eastern Washington). Ms. Clarke's somewhat pejorative comments call attention to the frustrations of lawyers, judges and probation officers who must try to understand the complexities of the system.
 
 
 75
 The federal sentencing guidelines system cries out for change. See Marc Miller & Daniel J. Freed, Suggestions for the President and the 103rd Congress on the Guideline Sentencing System, 5 Fed.Sent.R. 187 (Jan./Feb. 1993).
 
 
 76
 United States v. Smith, 997 F.2d 396, 399 (8th Cir.1993) (Bright, J., dissenting). In a separate concurrence to Smith, Judge John R. Gibson wrote, in part:
 
 
 77
 I agree that the sentencing guideline system cries out for change. The guidelines have not eliminated disparity, but have created a complex hypertechnical system consuming great amounts of judicial time for both trial and appellate judges. It is to be hoped that the legislative and executive branches will give careful review to the system. Perhaps a first step would be to make the guidelines simply that, guidelines.
 
 
 78
 Id. at 398.
 
 
 79
 I dissent from the majority's decision reversing the district court's resolution of the drug quality issue. In my view the trial court made a factual determination relative to the confusing material in the guidelines. No basis exists for calling that determination an error of law or clearly erroneous.
 
 
 
 *
 Honorable Myron H. Bright, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 In addition to the Government's sentencing challenges addressed in our opinion, the Government appeals from the district court's entry of a judgment of acquittal on the conspiracy conviction of Larry Joe Carroll for insufficient evidence. We find this challenge to be without merit. The defendants also raise the following issues that we find to be meritless: sufficiency of the evidence to convict the defendants of knowing participation in the charged conspiracy and of possession with intent to distribute; the sentencing of Thomas Spiker as an organizer or leader; alleged errors in the district court's instructions to the jury; the constitutionality of the sentences imposed under the Sentencing Guidelines; alleged perjury by the Government's expert witness; alleged discovery violations by the Government; the Government's alleged use of perjured testimony; allegedly prejudicial comments by the prosecutor; the district court's reservation of its rulings on motions for judgments of acquittal; the district court's refusal to sever the distribution charge in Count Two; and the district court's allowance of two opening statements by the Government following inadvertently erroneous statements by the prosecutor
 
 
 [2]
 Booth was originally indicted as a co-conspirator in this case, but subsequently entered a plea of guilty and agreed to cooperate as a Government witness during the defendants' trial
 
 
 [3]
 Count One of the indictment in this case charged each defendant with conspiring to manufacture and to possess with intent to distribute 100 grams or more of methamphetamine; Count Two charged only Larry Joe Carroll with distribution and possession with intent to distribute 10 grams or more of methamphetamine; Count Three charged each defendant with possession with intent to distribute 10 grams or more of methamphetamine; Counts Four and Five charged simple possession of methamphetamine and marijuana by a defendant who is not a party to this appeal; Count Six charged Michael Spiker and Larry Joe Carroll with possession of cocaine; Count Seven charged only Michael Spiker with possession of marijuana
 
 
 [4]
 Section 3E1.1 was amended following sentencing in this case to allow an additional one-level reduction in circumstances that are not relevant here. U.S.S.G. App. C, amend. 459 (November 1, 1992)
 
 
 [5]
 Effective November 1, 1992, Guidelines Sec. 2D1.4, dealing with attempts and conspiracies for drug crimes, was deleted and consolidated with the substantive offense section at Sec. 2D1.1. Application Note 2 was added to the commentary of the substantive offense guideline in Sec. 2D1.1 as Note 12. U.S.S.G. App. C, amend. 447 (November 1, 1992). Those amendments were enacted for purposes of simplification and resulted in no substantive change
 
 
 [6]
 At the time of the defendants' sentencing, the relevant offense conduct section for drug trafficking conspiracies, Sec. 2D1.4, provided that the base offense level should be set "as if the object of the conspiracy ... had been completed." U.S.S.G. Sec. 2D1.4 (November 1, 1990); see id. App. C, amend. 447 (November 1, 1992). Thus, Sec. 2D1.1, applicable to drug trafficking offenses, applied to the defendants
 
 
 [7]
 After the February 1991 sentencing in this case, the Guidelines were amended to replace references in the Drug Quantity Table to "Pure PCP" and "Pure Methamphetamine" with "PCP (actual)" and "Methamphetamine (actual)." U.S.S.G. App. C, amend. 395 (November 1, 1991). Because we apply the Guidelines in effect at the time of sentencing, United States v. Marin, 916 F.2d 1536, 1538 (11th Cir.1990), we will use terminology consistent with that used in the sentencing proceedings in the district court and will refer to pure methamphetamine
 
 
 [8]
 An amendment effective November 1, 1991, amended the equivalency table by providing for conversions to marijuana instead of cocaine and heroin. U.S.S.G. App. C, amend. 396 (November 1, 1991). In addition, "Methamphetamine (pure)" was replaced by "Methamphetamine (actual)," which is consistent with the use of methamphetamine (actual) in the Drug Quantity Table itself
 
 
 [9]
 We recently noted in United States v. Wilson, 993 F.2d 214, 216 (11th Cir.1993), that in light of the Supreme Court's decision in Stinson v. United States, --- U.S. ----, ----, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993), application of an intervening Guidelines interpretation by commentary promulgated after the offense could run afoul of the Ex Post Facto Clause. In this case, however, the Commission's clarifying amendments did not overrule any prior constructions of Sec. 2D1.1 but, rather, confirmed our reading of that section in the first instance. Therefore, this use of these clarifying amendments to the Guidelines commentary raises no ex post facto concerns