**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Douglas Miles DECKER,
Defendant–Appellant.**

No. 94–4027.

United States Court of Appeals,
Tenth Circuit.

May 31, 1995.

---

Steven G. Shapiro (Rodney G. Snow with him on the brief), of Clyde, Pratt & Snow, Salt Lake City, UT, for defendant-appellant.

David J. Schwendiman, Asst. U.S. Atty. (Scott M. Matheson, Jr., U.S. Atty., with him on the brief), Salt Lake City, UT, for plaintiff-appellee.

Before KELLY, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and VRATIL, District Judge.*

VRATIL, District Judge.

Defendant Douglas Miles Decker appeals the district court's denial of his motion to vacate, set aside or correct sentence under 28 U.S.C. § 2255. We exercise jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2255 and affirm.

■ Defendant pled guilty to one count of manufacturing methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Thereafter, the district court held an evidentiary hearing to determine the quantity of the drug for sentencing purposes. The court sentenced defendant to 46 months of imprisonment based on its finding that authorities had recovered 9.4 grams of 100% pure d,1-methamphetamine from defendant's residence. In doing so, the court treated the d,1-methamphetamine as "methamphetamine (actual)" under Section 2D1.1 of the sentencing guidelines.[1]

Defendant asserts that the district court erred in treating d,1-methamphetamine as "methamphetamine (actual)" because "methamphetamine (actual)" refers exclusively to d-methamphetamine. The parties agree that d-methamphetamine and 1-methamphetamine are optical isomers of each other and that, while d-methamphetamine has the physiological effect that methamphetamine users desire, 1-methamphetamine is nearly inert and has only minor physiological effects.[2] Defendant notes that because of its relative impotency, 1-methamphetamine appears separately in the guidelines and carries a relatively low offense level in comparison to other forms of methamphetamine. Defendant therefore concludes that because d,1-methamphetamine is 50% d-and 50% 1-methamphetamine, his base offense level should be calculated as if he had separately possessed two distinct drugs, i.e., by adding together the marijuana equivalents of 4.7 grams of "methamphetamine (actual)" for the d-methamphetamine and 4.7 grams of "1-methamphetamine." This method of calculation would substantially reduce his sentence. The government maintains that the district court's sentence was correct.

■ We review the district court's legal interpretations and application of the sentencing guidelines de novo and its factual findings under a clearly erroneous standard. United States v. McAlpine, 32 F.3d 484, 487–88 (10th Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 610, 130 L.Ed.2d 520 (1994); United States v. Bauer, 995 F.2d 182, 183 (10th Cir.1993).

### Analysis

Defendant does not challenge the district court's factual findings, nor does he dispute the identity, purity, amount or chemical makeup of the substance found at his residence. In other words, he concedes that he should be sentenced for manufacturing 9.4 grams of 100% pure d,1-methamphetamine. Defendant argues only that the district court misapplied the sentencing guidelines to the conceded facts and that the court's sentence runs contrary to the Sentencing Commis-

---

* The Honorable Kathryn H. Vratil, United States District Judge for the District of Kansas, sitting by designation.

1. Under the Drug Quantity Table of the guidelines, 9.4 grams of "methamphetamine (actual)" yields a base offense level of 24. U.S.S.G. § 2D1.1(c). Downward adjustments reduced defendant's offense level to 21. Based on defen-

dant's criminal history category; the applicable guideline range was 37–46 months.

2. For a detailed discussion of the isomeric properties of d-methamphetamine and 1-methamphetamine, see United States v. Bogusz, 43 F.3d 82, 88–89 (3d Cir.1994), cert. denied sub nom. O'Rourke v. U.S., —— U.S. ——, 115 S.Ct. 1812, 131 L.Ed.2d 736 (1995).

sion's intent to punish more severely those who manufacture either more drugs, or more potent drugs. Because his sentence is equivalent to the sentence he would have received if he had manufactured pure d-methamphetamine rather than half d-methamphetamine and half 1-methamphetamine, he insists the sentence is wrong. The issue we must resolve is whether 100% pure d,1-methamphetamine, like 100% pure d-methamphetamine, should be treated as "methamphetamine (actual)" under the guidelines. On this record, we do not hesitate in concluding that it should.

Few courts have addressed this issue, and the ones that have addressed it have apparently reached different conclusions. The problem in large part arises from the following note to the drug quantity table in the sentencing guidelines:

> Unless otherwise specified, the weight of a controlled substance set forth in the table refers to the entire weight of any mixture or substance containing a detectable amount of the controlled substance. If a mixture or substance contains more than one controlled substance, the weight of the entire mixture or substance is assigned to the controlled substance that results in the greater offense level. The terms "PCP (actual)" and "Methamphetamine (actual)" refer to the weight of the controlled substance contained in the mixture or substance.... In the case of a mixture of substance containing PCP or methamphetamine, use the offense level determined by the entire weight of the mixture or substance, or the offense level determined by the weight of the PCP (actual) or methamphetamine (actual), whichever is greater.

U.S.S.G. § 2D1.1(c) note * (1994 version).

In *United States v. Carroll,* 6 F.3d 735 (11th Cir.1993), *cert. denied sub nom. Jessee*

*v. U.S.,* —— U.S. ——, 114 S.Ct. 1234, 127 L.Ed.2d 577 (1994), the Eleventh Circuit analyzed this note and rejected defendant's argument that under the guidelines, "methamphetamine (actual)"[3] refers only to d-methamphetamine. The *Carroll* court held that the term "methamphetamine (actual)" refers to the relative *purity* of the methamphetamine and does not refer to a particular *form* of methamphetamine, *i.e.,* 1-methamphetamine (which is inert), d-methamphetamine (which is physiologically potent) or d,1-methamphetamine (a third form of methamphetamine).[4] *Id.* at 744. Accordingly, the Eleventh Circuit determined that "methamphetamine (actual)" includes d,1-methamphetamine for sentencing purposes under § 2D1.1. *Id.* at 745.

In *United States v. Bogusz,* 43 F.3d 82 (3d Cir.1994), *cert. denied sub nom. O'Rourke v. U.S.,* —— U.S. ——, 115 S.Ct. 1812, 131 L.Ed.2d 736 (1995), the Third Circuit agreed with *Carroll* that the term "methamphetamine (actual)" refers to the amount of the pure illegal product (in that case, the net amount of methamphetamine hydrochloride after all impurities, waste, byproducts and cutting agents are removed). *Id.* at 87. The Third Circuit went on to hold, rationally enough, that if defendant was to be sentenced under § 2D1.1 for "methamphetamine (actual)," the government was required to tender evidence of drug purity, *i.e.,* the quantity of pure methamphetamine hydrochloride contained in the mixture in question. *Id.* In *Bogusz,* such evidence had not been offered: the district court had tacitly assumed two critical facts: (1) that defendant's product was 100% pure and (2) that defendant's product was d-methamphetamine "rather than" 1-

---

**3.** The *Carroll* court noted that the Sentencing Commission amended the guidelines after defendant Carroll's conviction, replacing the term "pure methamphetamine" with the term "methamphetamine (actual)." *Id.* at 744, n. 7. For that reason, the court uses the term "pure methamphetamine" throughout its opinion. The *Carroll* court, however, did not view this amendment as a substantive change in the guidelines, and neither do we. We use "methamphetamine (actual)" because it was the terminology in effect at the time of defendant Decker's sentencing.

**4.** The *Carroll* court recognized that pure 1-methamphetamine was not intended to be treated as "methamphetamine (actual)" under the guidelines; however, the court commented that "[i]t is only because the Commission chose to distinguish L-methamphetamine from 'Methamphetamine' and 'Pure Methamphetamine' that 100% L-methamphetamine would not likewise constitute 100% 'Pure Methamphetamine.'" *Id.* at 745.

methamphetamine.[5] Because the district court had made no findings with respect to the purity or the isomeric composition of the subject methamphetamine, the Third Circuit remanded for further proceedings. In doing so, the Third Circuit announced its limited disagreement with *Carroll*, holding that references to "methamphetamine" and "methamphetamine (actual)" in the drug quantity table of § 2D1.1(c) refer solely to pure quantities of d-methamphetamine and that in order to calculate a base offense level for 1-methamphetamine, the substance in question must be converted into its marijuana equivalency. *Bogusz*, 43 F.3d at 91.

In *United States v. Cook*, 49 F.3d 663 (10th Cir.1995), as in *Carroll*, defendant claimed that the district court had improperly treated d,1-methamphetamine as "pure methamphetamine," rather than as a 50:50 mixture of two substances entitled to separate offense levels under the drug equivalency tables. In *Cook*, evidence concerning the chemical nature of d,1-methamphetamine was "entirely absent" from the record before us. *Id.* at 666. Accordingly, we determined that further fact-finding was necessary and remanded with instructions to determine whether d,1-methamphetamine is a separate "molecular form" of methamphetamine (as the *Carroll* court found) or simply a mixture of d-methamphetamine and 1-methamphetamine (as the *Bogusz* court found). *See id.*

In the instant case, the undisputed factual record prepares us to venture where *Cook* could not—and without wading deeply into the nuances of molecular chemistry. On these facts, we do not hesitate to hold that the district court correctly applied the sentencing guidelines. Here, the government expert explained, and defense counsel acknowledged, that methamphetamine may be manufactured through two distinct methods: the 1-ephedrine method, which produces d-methamphetamine, and the P2P method, which produces d,1-methamphetamine. Defendant here used the P2P method, and thereby produced a single substance that was not merely a "mixture"[6] of d-methamphetamine and 1-methamphetamine. On this record, the district court correctly understood that the methamphetamine molecule exists in different isomeric forms (d-methamphetamine being the "right-handed" isomer of its "left-handed" mirror image, 1-methamphetamine) and that d,1-methamphetamine is a single substance composed of exactly 50% of each of the two isomers.

For two reasons, the district court did not err in calculating defendant's sentence. First, paragraph 5 of the Application Notes to § 2D1.1(c) directs the court, in calculating the weight of any given controlled substance, to include "all salts, isomers, and all salts of isomers." As a result, even if defendant is correct in his factual argument that "methamphetamine (actual) refers only to pure d-methamphetamine, the district court was entitled to add the weight of the 1-methamphetamine, an isomer of d-methamphetamine, to the weight of the d-methamphetamine.[7]

Second, defendant in this case manufactured a substance containing d-methamphetamine and 1-methamphetamine, both of which are controlled substances under

---

5. The defendant in *Bogusz* did not argue that the product contained d,1-methamphetamine. The Third Circuit therefore left unresolved the factual question whether d,1-methamphetamine is a "third form of methamphetamine," as described in *Carroll*, 6 F.3d at 743, or merely a 50:50 combination of d-methamphetamine and 1-methamphetamine. *See Bogusz*, 43 F.3d at 89 n. 10.

6. Webster's Third New International Dictionary (1986) defines the term "mixture" as: "a portion of matter consisting of two or more components *that do not bear a fixed proportion to one another* and that however thoroughly commingled are regarded as retaining a separate existence." *Id.* at 1449 (emphasis added). D,1-methamphetamine's components by definition bear a fixed proportion to one another, *i.e.*, 50:50. Thus, this

definition supports the characterization of d,1-methamphetamine as a form of methamphetamine and discredits the assertion that it is merely a "mixture" of two different substances.

7. With all respect to the Third Circuit's analysis in *Bogusz*, paragraph 5 to the Application Notes seems to substantially vitiate any argument that the Sentencing Guidelines intend to distinguish between chemical isomers based on their relative physiological effects and to require resort to the drug equivalency table in cases involving d,1-methamphetamine or other isomers. In plain language, paragraph 5 takes note that controlled substances may contain isomers and directs the sentencing courts to include the weight of such isomers in determining drug quantity.

§ 2D1.1. The guidelines instruct that "[i]f a mixture or substance contains more than one controlled substance, the weight of the entire mixture or substance is assigned to the controlled substance that results in the greater offense level." U.S.S.G. § 2D1.1(c) note *. Thus, the district court's application of the guidelines was correct, even under defendant's theory. Under this theory, defendant manufactured a mixture containing 4.7 grams of d-methamphetamine, or "methamphetamine (actual)," and 4.7 grams of 1-methamphetamine. In this situation, the note directs the court to assign the weight of the entire mixture to the controlled substance carrying the greater offense level—in this case "methamphetamine (actual)." The district court properly did so in this case.

In the final analysis, the guidelines directed the district court to calculate the drug quantity in two ways and to use the calculation which resulted in the greater sentence. The first calculation was the weight of the entire substance, and the second was the weight of the pure methamphetamine. *See* U.S.S.G. § 2D1.1(c) note *. Under the first method, the district court was instructed to add 4.7 grams of d-methamphetamine and 4.7 grams of 1-methamphetamine, and to assign the weight of the entire substance, 9.4 grams, to the offense level of the d-methamphetamine. Under the second method, the district court was instructed to calculate the offense level based on the weight of the "methamphetamine ·(actual)," including its isomers, which we have defined to include 100% pure d,1-methamphetamine. By either method, the drug quantity was 9.4 grams and defendant's offense level, with adjustments, was 21, which level corresponds to a sentence of 37–46 months. Therefore, we find no error in the district court's calculation of defendant's sentence.

■ Finding no ambiguity in the guidelines as applied in this case, we reject defendant's plea for leniency. The rule of lenity is not applicable unless there is a

> "grievous ambiguity or uncertainty in the language and structure of the Act," such that even after a court has " 'seize[d] every thing from which aid can be derived' " it is still "left with an ambiguous statute."

> "The rule [of lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers."

*United States v. Killion,* 7 F.3d 927, 935–36 (10th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1106, 127 L.Ed.2d 418 (1994), quoting *Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (internal citations omitted). Because we find no ambiguity in the guidelines in this case and no error in the district court's interpretation and application of them, we affirm the district court's sentence of defendant.