STATE of Iowa, Appellee,

v.

David Lee CASADY, Appellant.

No. 97–1568.

Supreme Court of Iowa.

July 8, 1999.

Linda Del Gallo, State Appellate Defender, and Patricia Reynolds, Assistant State Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Mary Tabor, Assistant Attorney General, Rick L. Lynch, County Attorney, and Paul Zingg and Ron Kelly, Special Prosecutors, for appellee.

Considered by HARRIS, P.J., and LARSON, CARTER, SNELL, and TERNUS, JJ.

LARSON, Justice.

David Casady appeals his conviction for conspiracy to manufacture more than five grams of methamphetamine, a class "B" felony under Iowa Code section 124.401(1)(b)(7) (1997). We affirm.

### I. *The Facts and Prior Proceedings.*

Under the record in this case, the jury could reasonably have found the following facts. Law enforcement officers had maintained surveillance of the Taylor Agri Products Company in Bloomfield, Iowa, because of frequent thefts of anhydrous ammonia during the summer of 1996. Casady worked at Bimco, a company located adjacent to Taylor Agri Products. Law enforcement officers observed Casady's car parked in the Bimco parking lot after hours on several occasions, causing the surveillance team to identify Casady as a suspect in the anhydrous thefts.

Late on the night of February 24, 1997, police officers observed two men, one looking like Casady, at the Taylor site. They observed a vapor cloud rise, indicating an ammonia escape. The men, carrying an object, left in their car without their headlights on, and went to Randy Lockman's house. The officers obtained a search warrant for Lockman's house. Based on this search and other evidence, Byers, Casady, and Lockman were charged with conspiracy to manufacture methamphetamine. Lockman's trial was severed, and Casady and Byers were tried together.

### II. *The Issues.*

On appeal Casady complains (1) there was insufficient evidence to support his

conviction, (2) the court erred in admitting certain evidence, (3) his trial counsel provided ineffective assistance, and (4) the court erred in judicially noting that d-methamphetamine is "methamphetamine" under Iowa Code section 124.401(1)(b)(7).

### III.  *Sufficiency of the Evidence.*

■ We will uphold a jury verdict under a sufficiency-of-the-evidence challenge if it is supported by substantial evidence. *State v. Chang,* 587 N.W.2d 459, 461–62 (Iowa 1998).  If a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt, the evidence is substantial.  *State v. Thomas,* 561 N.W.2d 37, 39 (Iowa 1997).  We review the evidence in the light most favorable to the State, and this includes all legitimate inferences that may fairly and reasonably be deduced from the evidence.  *Id.*

Iowa Code section 124.401(1) provides:
[I]t is unlawful for any person to manufacture, deliver, or possess with the intent to manufacture or deliver, a controlled substance, a counterfeit substance, or a simulated controlled substance, or to act with, enter into a common scheme or design with, *or conspire with one or more other persons to manufacture, deliver, or possess with the intent to manufacture or deliver a controlled substance,* a counterfeit substance, or a simulated controlled substance.

(Emphasis added.)  In this case, the State charged Casady with the conspiracy alternative.  The penalties for a violation of this section are prescribed by section 124.401(1)(b):

Violation of this subsection, with respect to the following controlled substances, counterfeit substances, or simulated controlled substances is a class "B" felony, and in addition to the provisions of section 902.9, subsection 1, shall be punished by a fine of not less than five thousand dollars, nor more than one hundred thousand dollars:

. . . .

(7) More than five grams but not more than five kilograms of methamphetamine, its salts, isomers, or salts of isomers, or analogs of methamphetamine, or any compound, mixture, or preparation which contains any quantity or detectable amount of methamphetamine, its salts, isomers, or salts of isomers, or analogs of methamphetamine.

Iowa Code section 706.1 sets out the general law of conspiracy:

1.  A person commits conspiracy with another if, with the intent to promote or facilitate the commission of a crime which is an aggravated misdemeanor or felony, the person does either of the following:

*a.*  Agrees with another that they or one or more of them will engage in conduct constituting the crime or an attempt or solicitation to commit the crime.

*b.*  Agrees to aid another in the planning or commission of the crime or of an attempt or solicitation to commit the crime.

. . . .

3.  A person shall not be convicted of conspiracy unless it is alleged and proven that at least one conspirator committed an overt act evidencing a design to accomplish the purpose of the conspiracy by criminal means.

The jury was instructed on the general elements of conspiracy.

Under the conspiracy alternative, as charged here, the State was required to prove that Casady agreed with Lockman and/or Byers that they would manufacture, deliver, or possess with intent to deliver methamphetamine and that at least one of the conspirators committed an overt act. Casady argues the State produced insufficient evidence of an agreement.

■ The State did not offer direct evidence of an agreement, but it was not required to do so; it may prove an agreement through circumstantial evidence and

" '[a]ll legitimate inferences arising reasonably and fairly from the evidence may be indulged in to support the verdict.' " *State v. Mapp*, 585 N.W.2d 746, 748 (Iowa 1998) (quoting *State v. Ruiz*, 496 N.W.2d 789, 792 (Iowa App.1992) (citations omitted)). We have said

> [a]n agreement that, because of its purpose or the means contemplated, amounts to a conspiracy need not be formal or express, but may be a tacit understanding; the agreement may be inherent in and inferred from the circumstances, especially declarations, acts, and conduct of the alleged conspirators.

*Mapp*, 585 N.W.2d at 748 (quoting 16 Am. Jur.2d *Conspiracy* § 10, at 204–05 (1998) (footnotes omitted)).

█ There was substantial evidence supporting a finding of an agreement to manufacture methamphetamine. Two witnesses testified Casady watched Lockman crush cold medications and cook a mixture in the microwave, activities that coincide with manufacturing methamphetamine. These witnesses testified that Casady and Byers left Lockman's house shortly before midnight and returned within a half hour, a time frame consistent with the testimony of the surveillance team, which had observed a vehicle pull up to the Taylor Agri Products facility. One of the two men who got out of the car matched Casady's description. Lieutenant Smith saw a vapor cloud indicating anhydrous ammonia was escaping from a tank. Two people ran back to the vehicle, one of them carrying something, and the vehicle left without its headlights on. Captain Sandegren followed the car as it left the Taylor business without losing sight of it. Officer Greg Francisco, who had been watching Lockman's residence, observed a car pull up just after the incident at the Taylor facility. Two men got out and took something from the back seat into Lockman's garage. Officer Francisco did not leave his post until the other officers returned with a search warrant. In the meantime, no other vehicles or persons had left or approached the Lockman residence. When the officers executed the search warrant, they found Casady hiding under a car in Lockman's garage. Damp gloves, smelling strongly of anhydrous ammonia, were found in Casady's pocket. The sheriff's deputy who found the gloves and identified the odor had previously worked at the Taylor site and was familiar with anhydrous ammonia.

The officers also seized baking dishes containing a pink liquid and a white solid mixture, as well as other jars containing melted pill residue. They found lithium batteries with the coating stripped off, empty boxes of cold tablets, a product called Drain Power, and starting fluid. All of these substances were consistent with the manufacture of methamphetamine, according to the evidence.

Investigators also found a two-quart thermos full of anhydrous ammonia behind the Lockman residence. Byers was searched, and the officer found a sales receipt from a local store dated February 24 and showing the purchase of two bottles of Actifed tablets, three bottles of Sudafed tablets, Drain Power, and two packages of lithium batteries.

A narcotics agent testified that the defendants appeared to be engaged in the "Nazi method" of making methamphetamine, in which the anhydrous ammonia is generally obtained at the end of the process because it evaporates quickly. A typical batch produces one to two ounces; one ounce contains 28.35 grams. A criminologist testified that she had tested the substances seized and found they contained d-pseudoephedrine, a precursor or "starter chemical" for methamphetamine.

When the evidence is viewed in the light most favorable to the verdict, we believe it clearly supports the jury's finding of a conspiracy to manufacture methamphetamine and the part Casady played in it.

## IV. *The Evidentiary Rulings.*

Casady challenges three evidence rulings on appeal: (1) admitting a laboratory

report from a criminalist from the Division of Criminal Investigation, (2) admitting testimony concerning prior thefts of anhydrous ammonia at the Taylor site and (3) admitting a videotape of the crime scene showing a hand gun in a drawer at Lockman's residence.

■ A. *The laboratory report.* A report from the state criminalistics laboratory contained an analysis of the substances found at Lockman's residence. Nila Bremer, who prepared the report, was a witness at the trial. She described the "Nazi" method of manufacturing methamphetamine and concluded 17.3 grams of d-pseudoephedrine, a prechemical to d-methamphetamine, were present. She estimated that skilled operators could produce 15.9 grams of d-methamphetamine from the precursor chemicals; unskilled operators could produce 7.9 grams.

Iowa Code section 691.2 provides that reports from the state criminalistics laboratory are admissible if they are determined to be relevant. This witness has a master's degree in chemistry and eighteen years experience in the criminalistic laboratory with specialized training in forensic chemistry and clandestine laboratories. She is clearly qualified by "knowledge, skill, experience, training and education," and her testimony would assist a trier of fact to understand the evidence or determine a fact in issue. *See* Iowa R. Evid. 702. In fact, Casady does not dispute the witness's qualifications as an expert or the relevancy of her evidence.

This witness's opinion was based on her personal observations of the substances, her discussions with other forensic chemists, her reliance on at least one textbook, and a comparison of the yield obtained from similar chemical reactions. Her testimony was clearly relevant because it was necessary to prove that the conspiracy was to manufacture methamphetamine, and under Iowa Code section 124.401(1)(b)(7), it was necessary for the jury to determine if Casady conspired to make more than five grams of it. The only way for the jury to determine that, without merely speculating, was to hear from an expert.

Federal courts frequently make determinations as to the expected yield from precursor chemicals because federal sentencing guidelines provide increased penalties for larger amounts of potential yields. For example, the sixth circuit upheld the defendants' sentences based on expert testimony that the 4180 grams of precursor chemicals in a crock pot would yield approximately 250 grams of methamphetamine. *United States v. Jennings,* 83 F.3d 145, 149 (6th Cir.1996); *see also United States v. Krankel,* 164 F.3d 1046, 1054 (7th Cir.1998) (upholding defendant's sentence where government presented expert testimony regarding how much methamphetamine defendant could produce from chemicals found in defendant's residence); *United States v. August,* 86 F.3d 151, 155 (9th Cir.1996) (upholding estimate of amount of methamphetamine based on expert's testimony that flask seized would produce 500 to 1000 grams of methamphetamine per reaction); *United States v. Carroll,* 6 F.3d 735, 742 (11th Cir.1993) (expert estimated that fifty to seventy-five percent of theoretical yield was realistic amount); *United States v. Funk,* 985 F.2d 391, 394 (8th Cir.1993) ("practical yield" of methamphetamine depended on prior experience and available equipment). *But see United States v. Hamilton,* 81 F.3d 652, 654–55 (6th Cir.1996) (holding trial court could not automatically apply fifty percent formula for converting precursor chemicals into methcathinone absent particularized findings regarding defendant's lab).

Casady argues that the court should find the district court erred because the admission of the State's report was a "neat condensation" of the State's case against Casady. *See State v. Gallup,* 500 N.W.2d 437, 441 (Iowa 1993) (evidence sent to jury room with evidence tag attached generally prejudicial error because it has the effect of unduly emphasizing the State's case; held not prejudicial in this case because defendant admitted sale of drugs). *Gallup* was based in part on the hearsay nature of the evidence tag. *Id.* In the present case,

the evidence was not hearsay but was properly admitted under Iowa Code section 691.2. ("Any report ... of the criminalistics laboratory shall be received in evidence....") This statute creates an exception to the hearsay rule. *State v. Dykers,* 239 N.W.2d 855, 857 (Iowa 1976) (considering Iowa Code § 749A.2 (1973) (now § 691.2)). The court did not err in admitting the report and allowing it to go to the jury room.

B. *Prior thefts of anhydrous ammonia.* Captain Sandegren and Lieutenant Smith testified about prior thefts of anhydrous ammonia from the Taylor site. Casady contends this was improper "other crimes" evidence. However, Casady's trial counsel failed to object to this evidence, so we reserve this issue for our later discussion of Casady's claim of ineffective assistance of counsel.

■ C. *Videotape of the arrest scene.* A videotape of the arrest scene showed a gun, wrapped in plastic, in a drawer in Lockman's bedroom. The videotape was shown to the jury, but the court instructed the officer narrating the tape not to mention the gun and he did not. The videotape did not emphasize the gun, and it was clear that the residence in which it was located was Lockman's, not Casady's. Further, the jury was not permitted to take the videotape to the jury room. Any impact of the gun in the videotape did not render the court's admission of it an abuse of discretion.

## V. *The Ineffective–Assistance–of–Counsel Claims.*

Casady complains of ineffective assistance of counsel in three respects: (1) failure to object to a form of verdict requiring the jury to determine the amount of methamphetamine that could have been produced from the precursor chemicals, (2) failure to object to a "mug shot," and (3) failure to object to evidence of prior anhydrous ammonia thefts.

■ We review a Sixth Amendment claim of ineffective assistance of counsel de novo. *State v. Ceaser,* 585 N.W.2d 192, 195 (Iowa 1998). We presume that counsel has performed competently. *Mapp,* 585 N.W.2d at 747. While we often preserve ineffective-assistance claims for postconviction relief, we consider such claims on direct appeal if the record is sufficient. To prevail on an ineffective-assistance claim, Casady must prove by a preponderance of the evidence that (1) his trial counsel failed to perform an essential duty, and (2) prejudice resulted from counsel's error. *Ceaser,* 585 N.W.2d at 195.

■ A. *Amount of methamphetamine yield.* As a part of the guilty verdict form, the jury was required to determine whether the amount of methamphetamine Casady had conspired to produce was more than five grams. Casady argues his defense counsel should have objected to this inquiry because this allowed the jury to speculate about the yield of methamphetamine that could be produced from the precursor chemicals. "It was improper for the jury to be questioned at all about the meth 'yield to be,'" according to him. At the time of the arrest, the officers found only .11 grams of manufactured methamphetamine, and Casady argues that amount—not the *potential* amount—should set the parameters of his penalty. His theory is he "could not be found guilty of the crime of conspiracy to manufacture a controlled substance under Iowa Code chapter 124.401(1) *unless he, or a co-conspirator, succeeded in producing meth as defined in the statute.*" (Emphasis added.) This is not true. The first alternative means of violating the statute is the actual manufacture of drugs, but the second alternative includes a conspiracy to manufacture it. *See* Iowa Code § 124.401(1). Contrary to Casady's argument, it is not necessary for the State to prove the second alternative by also proving the first. While the State must show an overt act toward the accomplishment of the conspiracy, Iowa Code § 706.1(3), it did not have to prove the completed act.

**B.** *Casady's "mug shot."* Casady argues his trial counsel should have objected to the admission of a picture of Casady taken when he was arrested—a "mug shot." He says the photograph was prejudicial because it showed him with long hair, a full beard, and dressed in orange. The photograph was properly admitted. The investigating officers testified that a bearded man was present at the Taylor site, but at the trial Casady did not have a full beard. The photograph was admissible to show Casady's appearance at the time of his arrest. *State v. Rice*, 543 N.W.2d 884, 888 (Iowa 1996).

**C.** *Prior anhydrous ammonia thefts.* Casady claims ineffective assistance for his counsel's failure to challenge the evidence of prior anhydrous ammonia thefts. Even assuming his counsel failed to perform an essential duty, this does not entitle Casady to relief; he must also show he was prejudiced. *Ceaser*, 585 N.W.2d at 195. The evidence of Casady's involvement, even without the prior-thefts evidence, was very substantial. He was identified by eyewitnesses at the scene of the manufacture of the methamphetamine. Those witnesses also established the timing of Casady's leaving and returning to the scene that correlated exactly with the officers' testimony of the timing of the anhydrous ammonia thefts. Moreover, Casady's gloves smelled strongly of anhydrous ammonia at the time of his arrest.

We conclude that Casady has failed to establish prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984).

## VI. *The Judicial Notice Issue.*

After the State's evidence was completed, it requested that the court take judicial notice that d-methamphetamine (which was the substance identified by the State's expert) meets the legal definition of methamphetamine under section 124.401(1)(b)(7). Casady objected on the basis that the issue required expert testimony of a chemist. The court took judicial notice that d-methamphetamine is a salt, isomer, or salt of an isomer and is covered by the statute.

Iowa Rule of Evidence 201(b), governing judicial notice, provides:

A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

A court may take judicial notice of a matter that is of common knowledge or capable of certain verification. *In re E.H. III*, 578 N.W.2d 243, 250 (Iowa 1998) (citing *Motor Club of Iowa v. Department of Transp.*, 251 N.W.2d 510, 517 (Iowa 1977)). For example, the court has taken judicial notice of "the indisputable scientific fact cocaine, or cocaine hydrochloride, is a substance within the meaning of 'narcotic drug' in [what was then section] 204.101(17)(d)." *State v. Monroe*, 236 N.W.2d 24, 32 (Iowa 1975).

It is not necessary that a scientific principle be commonly known among laypersons to be judicially noted; it is sufficient if the principle is commonly accepted in the appropriate scientific community. *See* Edward W. Cleary, et al., *McCormick on Evidence* §§ 330, 764 (2d ed.1972). According to a chemical dictionary, d-methamphetamine is the chemical notation for the mirror image form of the methamphetamine molecule. The other side is labeled l-methamphetamine. *See* The Condensed Chemical Dictionary 693 (7th ed.1966). According to that authority, both forms are methamphetamine, *id.*, and the Iowa statute makes no distinction between the d and l forms. Moreover, d-methamphetamine was the substance identified here, and it is this form "which has the active physiological effects characteristic" of methamphetamine. *Carroll*, 6 F.3d at 743. The nature of the d-methamphet-

amine was "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Iowa R. Evid. 201(b), and the court did not err in judicially noting it.

We find no error in the trial of this case and therefore affirm.

**AFFIRMED.**