COURT OF APPEALS
DECISION
DATED AND FILED

February 13, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP79-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2021CF1178

IN COURT OF APPEALS
DISTRICT IV

---

STATE OF WISCONSIN,

    PLAINTIFF-APPELLANT,

  V.

WALTER L. JOHNSON,

    DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Dane County: JOHN D. HYLAND, Judge. *Reversed in part; cause remanded for further proceedings.*

Before Kloppenburg, P.J., Blanchard, and Graham, JJ.

¶1 KLOPPENBURG, P.J. The State of Wisconsin charged Walter Johnson with various crimes arising from a motor vehicle crash that resulted in the death of the passenger in the vehicle operated by Johnson and injuries to Johnson

and the driver of another vehicle involved in the crash. Pertinent here, the State charged Johnson with two counts of violating statutes prohibiting operating a motor vehicle with a detectable amount of a restricted controlled substance, namely, methamphetamine, in the blood. Johnson moved to dismiss the two counts on the ground that the State could not prove that Johnson had a detectable amount of a restricted controlled substance in his blood. Johnson's argument was based on the fact that methamphetamine has two isomers, dextromethamphetamine ("D-meth") and levomethamphetamine ("L-meth," also known as "levmetamfetamine").[1] Johnson contended that only D-meth, and not L-meth, is a restricted controlled substance for purposes of the statutes prohibiting operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood. For this reason, Johnson argued, the two counts of operating with a detectable amount of a restricted controlled substance must be dismissed because the analysis of Johnson's blood does not show that the methamphetamine in his blood was D-meth.

¶2      In the part of the circuit court's nonfinal pretrial order at issue here, the court concluded that L-meth is not a restricted controlled substance as that term is defined in the relevant statutes and, therefore, that the State would have to prove that Johnson had a detectable amount of D-meth in his blood to meet its burden of proving that Johnson was operating with a detectable amount of a restricted controlled substance in his blood. Said another way, it would not be

---

[1] Isomers are chemical compounds, "'commonly referred to as chemical relatives[,]' … 'which have the same molecular formula but different molecular structures.'" *State ex rel. Huser v. Rasmussen*, 84 Wis. 2d 600, 611 n.3, 267 N.W.2d 285 (1978) (quoted sources omitted). As discussed below, and not disputed by Johnson, the two isomers discussed in this opinion are "forms" of methamphetamine. *State v. Casady*, 597 N.W.2d 801, 808 (Iowa 1999) (citing The Condensed Chemical Dictionary 693 (7th ed. 1966)).

sufficient for the State to prove only that Johnson had a detectable amount of methamphetamine in his blood because L-meth is not a restricted controlled substance. Consistent with these conclusions, the court denied Johnson's motion to dismiss the two counts, in order to give the State the opportunity to prove that Johnson's blood had a detectable amount of D-meth. We granted the State's petition for leave to appeal this part of the order requiring the State to prove that Johnson had a detectable amount of D-meth in his blood. *See* WIS. STAT. § 808.03(2) (2021-22).[2]

¶3　　We conclude that, under a plain language interpretation of the relevant definitional statutes, methamphetamine is a restricted controlled substance for purposes of the statutes prohibiting operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood. We also conclude that the relevant statutes do not exclude L-meth from that definition or otherwise distinguish between the isomers of methamphetamine, L-meth and D-meth. We further conclude that, as a result, the State need not prove that the methamphetamine detected in Johnson's blood was D-meth. In other words, proving that Johnson operated a vehicle while there was a detectable amount of methamphetamine in his blood suffices to prove that Johnson violated statutes prohibiting operating with a detectable amount of a restricted controlled substance in the blood. We also reject Johnson's alternative argument that, if we interpret the statutes this way, the statutes are unconstitutional.

---

[2] The circuit court's order contains two other parts that address issues that are not relevant to the issues on appeal. We state no opinion about those parts of the court's order.

All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶4 Accordingly, we reverse that part of the circuit court's order stating that L-meth is not a restricted controlled substance, that the State is required to prove that Johnson had a detectable amount of D-meth in his blood, and that it is insufficient for the State to prove only that Johnson had a detectable amount of methamphetamine in his blood. We reverse the order in part and remand to the circuit court for further proceedings consistent with this opinion.

## BACKGROUND

¶5 In April 2022, the State charged Johnson with four counts in connection with the motor vehicle crash, only two of which are pertinent to this appeal: count 1, homicide by vehicle with a detectable amount of a restricted controlled substance in the blood, contrary to WIS. STAT. § 940.09(1)(am); and count 3, operating with a detectable amount of a restricted controlled substance in the blood, causing injury, contrary to WIS. STAT. § 346.63(2)(a)3.[3]

¶6 The criminal complaint alleged as follows. At approximately 2:00 p.m. on September 4, 2020, police responded to a crash on Stoughton Road in the city of Madison, where a car driven by Johnson had rolled and struck another vehicle head-on before coming to rest down an embankment on the frontage road. The Wisconsin State Patrol determined that Johnson's car had been traveling over 120 miles per hour before the crash. Johnson and his only passenger were ejected from the car. As a result of the crash, the passenger in Johnson's car died, and Johnson and the driver of the vehicle that was struck by Johnson's car were injured.

---

[3] The other two counts are operating a vehicle while suspended and first-degree reckless homicide.

¶7 At 4:42 p.m., medical personnel took a blood sample from Johnson, and the blood sample was provided to the Wisconsin State Laboratory of Hygiene (the "Hygiene Laboratory") for testing. The Hygiene Laboratory prepared a report showing that Johnson's blood contained, as pertinent here, 24 nanograms per milliliter of methamphetamine. The Hygiene Laboratory discarded Johnson's blood sample in March 2022, consistent with Hygiene Laboratory procedures.

¶8 In July 2022, Johnson filed a motion to dismiss counts 1 and 3 on the ground that the State could not meet its burden of proof, among other grounds not relevant to this appeal. Specifically, Johnson argued that the isomer of methamphetamine that is L-meth is not a restricted controlled substance as defined in the statutes. He asserted that on or around September 4, 2020, he was using one or more over-the-counter medications known to contain L-meth, namely, "Vicks Vaporub, Vicks Vapoinhalers, and the generic equivalents." As a result, Johnson asserted, a retesting of his blood would reveal that his blood contained L-meth, which is not a restricted controlled substance, and not D-meth, which is the isomer of methamphetamine that is a restricted controlled substance. Johnson further argued that, because his blood sample had been destroyed, the State could not prove that the substance detected in Johnson's blood was D-meth and, accordingly, could not prove that his blood had a detectable amount of a restricted controlled substance.

¶9 In April 2023, Johnson filed a "supplemental" motion to dismiss. He reiterated his interpretation of WIS. STAT. § 340.01(50m), the definition of restricted controlled substance that applies to one of his charged offenses, as

5

excluding L-meth.[4] More specifically, Johnson argued that § 340.01(50m), when read in context, does not apply to L-meth, or that, if this provision is ambiguous, the legislative history shows that the legislature did not intend to apply it to L-meth. He also reiterated his argument that the State could not meet its burden of proof as to counts 1 and 3 without the ability to prove that Johnson's blood contained D-meth, which it could not prove because the blood sample had been destroyed. Alternatively, Johnson argued that, if § 340.01(50m) applies to L-meth, enforcing that provision in combination with the statutes prohibiting operating with a detectable amount of a restricted controlled substance in the blood is unconstitutional as applied to him.

¶10 The circuit court ultimately held three evidentiary hearings on Johnson's motion to dismiss counts 1 and 3, at which Hygiene Laboratory employees and a forensic toxicologist testified. Their testimony established, among other things, that L-meth and D-meth produce vastly different effects on the body, with D-meth causing significantly greater physiological effects than the same amount of L-meth, and that the Hygiene Laboratory does not have the specialized equipment needed to perform the analysis to distinguish between L-meth and D-meth in the blood. In addition to the testimony, exhibits introduced at the hearings and in support of Johnson's motion to dismiss counts 1 and 3 indicated that D-meth, "what we would normally consider street methamphetamine," causes agitation, increased risk-taking, and difficulty

---

[4] As explained in detail below, while Johnson now refers to only one of the definitions, WIS. STAT. § 340.01(50m), there are three statutory definitions of restricted controlled substance that apply to Johnson's charges: WIS. STAT. §§ 340.01(50m), 939.22(33), and 967.055(1m)(b). In this opinion we address all three definitions, but as we explain below, the three statutes share the same relevant text and there is no distinction among them that matters for purposes of this appeal.

concentrating, and may result in risky driving. In comparison, similar quantities of L-meth in the blood produce milder and less impairing effects than D-meth.

¶11 In its ruling addressing Johnson's motion to dismiss, the circuit court acknowledged that L-meth may "create impairment when taken in quantities substantially exceeding the recommended dose," but noted that "such conduct is otherwise regulated in the Motor Vehicle Code." The court concluded that, based on its interpretation of the relevant statutes and "[t]he evidence adduced at the evidentiary hearings," L-meth "is not a restricted controlled substance as defined within the Motor Vehicle Code," and, accordingly, the State must prove that the substance in Johnson's blood was D-meth. However, the court declined to dismiss counts 1 and 3 because at trial "the State may be in a position to meet its burden through corroborative and/or circumstantial evidence that the substance [in Johnson's blood] was [D-meth]." Accordingly, the court denied Johnson's motion to dismiss.

¶12 The State petitioned for leave to appeal the part of the circuit court's order requiring the State to prove that Johnson's blood had a detectable amount of D-meth, and we granted the petition. We provide additional facts as necessary in the discussion that follows.

## DISCUSSION

¶13 The issue on appeal is whether one of the isomers of methamphetamine, L-meth, is a restricted controlled substance, in which case the State here is not required to prove that Johnson had a detectable amount of the other isomer of methamphetamine, D-meth, in his blood, but instead merely needs to prove that there was a detectable amount of methamphetamine in his blood. This requires us to interpret the statutes defining a restricted controlled substance

7

for purposes of the statutes prohibiting operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood.[5]

¶14 As a preliminary matter, as noted above and explained in more detail in the footnote below, there are three substantively identical statutory definitions of restricted controlled substance that apply to Johnson's charges: WIS. STAT. §§ 340.01(50m), 939.22(33), and 967.055(1m)(b).[6] The State's principal argument on appeal is that L-meth is a restricted controlled substance under a plain language interpretation of these statutes. Johnson makes three arguments in response: (1) the State forfeited its statutory interpretation argument by failing to make it before the circuit court; (2) § 340.01(50m) is ambiguous, and the

---

[5] Although it does not affect the analysis in this appeal, to explain some of our references we note that the experts in this case suggested in testimony that two and only two isomers of methamphetamine—L-meth and D-meth—either have been so far identified by scientists or could exist based on current scientific understanding. The parties and the circuit court appear to have operated from this assumption, and we follow it in our discussion.

[6] The State charged Johnson with two offenses, both involving the operation of a motor vehicle with a detectable amount of a restricted controlled substance in his blood, one under the Wisconsin motor vehicle code, WIS. STAT. § 346.63(2)(a)3., and one under the criminal code, WIS. STAT. § 940.09(1)(am). The definition of restricted controlled substance in WIS. STAT. § 340.01(50m) applies to the charge under the motor vehicle code. See § 340.01 ("In … chs. 340 to 349 …, the following words and phrases have the designated meanings…."). The definition of restricted controlled substance in WIS. STAT. § 939.22(33) applies to the charge under the criminal code. See § 939.22 ("In chs. 939 to 948 and 951, the following words and phrases have the designated meanings…."). In addition, the criminal procedure code contains a definition in WIS. STAT. § 967.055(1m)(b) of restricted controlled substance that applies to the prosecution of both charges. See § 967.055(1)(a) (setting forth the legislature's intent "to encourage the vigorous prosecution of … offenses concerning the operation of motor vehicles by persons with a detectable amount of a restricted controlled substance in [their] blood"); WIS. STAT. § § 967.01 (WISCONSIN STAT. chs. 967-979 "govern all criminal proceedings").

As referenced above, throughout his briefing on appeal Johnson bases his argument exclusively on an interpretation of WIS. STAT. § 340.01(50m). Johnson does not cite or otherwise refer to the other definitions in WIS. STAT. §§ 939.22(33) and 967.055(1m)(b). As noted below, the three definitions differ primarily in how they are formatted and are otherwise identical for purposes of this appeal. Because all three definitions apply to the charges at issue, our analysis of that identical substantive language, quoted below, applies to all three of them.

legislative history shows that the legislature did not intend for § 340.01(50m) to apply to L-meth; and (3) if this court concludes that the statute applies to L-meth, we should nonetheless affirm the circuit court's requirement that the State prove that Johnson's blood contained a detectable amount of D-meth based on his argument that the definitional statutes, read together with the enforcement statutes under which he has been charged, are unconstitutional.

¶15 We first explain our conclusion that the State sufficiently raised and preserved the statutory interpretation issue for appeal. We then explain our conclusion that, applying a plain language interpretation of the statutes at issue, L-meth is a restricted controlled substance, with the result that on counts 1 and 3 the State has to prove only that Johnson had a detectable amount of methamphetamine in his blood. Finally, we explain our conclusion that Johnson fails to show that the statutes are unconstitutional.

## I. Forfeiture

¶16 As a general rule, we do not consider arguments raised for the first time on appeal. *See* ***Townsend v. Massey***, 2011 WI App 160, ¶¶23-27, 338 Wis. 2d 114, 808 N.W.2d 155. One rationale for this rule is that it prevents disruption of the judicial process by allowing the circuit court the opportunity to address arguments in the first instance. ***Id.***, ¶26. Requiring a party to raise all arguments in the circuit court also gives the opposing party notice and an opportunity to address the arguments. ***Id.*** Further, the rule functions to prevent appellate courts from blindsiding circuit courts with reversals based on legal theories that did not originate in their forum. ***Id.***, ¶25. To that end, the "rule focuses on whether particular arguments have been preserved, not on whether general issues were raised before the circuit court." ***Id.***; *see also* ***State v. Rogers***,

196 Wis. 2d 817, 828-29, 539 N.W.2d 897 (Ct. App. 1995) (explaining that, to preserve its right to appeal, a party must do more than "signal its general interest in" making an argument; the forfeiture rule "requires that the appellant articulate each of its theories to the [circuit] court").

¶17 But a party has not forfeited an argument on appeal when it merely refines an argument that it made in the circuit court or introduces additional support for one of the arguments that it made in the circuit court. *See State v. Piddington*, 2000 WI App 44, ¶11, 233 Wis. 2d 257, 607 N.W.2d 303 (concluding that the State did not forfeit its argument because "[t]he argument the State now makes is at most a refinement of the argument it presented in the [circuit] court"). Here, the record establishes that, in the circuit court, the State squarely presented an argument that both isomers of methamphetamine, L-meth and D-meth, are a "restricted controlled substance" under a plain meaning interpretation of the relevant statutes.

¶18 Johnson filed a series of motions to dismiss counts 1 and 3 that shared the following issue: that L-meth is not a "restricted controlled substance," and, given the Hygiene Laboratory's inability to distinguish between L-meth and D-meth, there was no probable cause to support the charges based on operating with a detectable amount of a restricted controlled substance in the blood. In responding to Johnson on this very issue, the State made an argument that squarely addressed the interpretation of the definitional statutes. It made essentially the same argument that it now advances on appeal, with a few refinements that it now adds. The circuit court initially ruled for the State on this issue, but it later ruled for the defense. After the court's initial ruling and before its final one, the State explicitly referenced its earlier argument. While the State did not elaborate on it

or repeat it in detail, the later reference was adequate to alert Johnson and the circuit court that the State was evoking its earlier argument.

¶19 Thus, the State did not forfeit the argument, for at least the reason that it explicitly referenced its earlier argument in the lead-up to the court's final decision. Further, even if the State had forfeited this argument, we would address it. *See **State ex rel. Universal Processing Servs. of Wis., LLC v. Circuit Ct. of Milwaukee Cnty.**, 2017 WI 26, ¶53, 374 Wis. 2d 26, 892 N.W.2d 267 (reviewing courts may disregard forfeiture "and address the merits of an unpreserved issue in an appropriate case"). Both sides had a full opportunity to brief the argument in the circuit court, we have all the facts that either side suggests are needed, and the parties have fully briefed this argument on appeal.

## II. Is L-meth a Restricted Controlled Substance?

¶20 Having concluded that we will address the State's statutory interpretation argument, we now set forth the standard of review and relevant legal principles governing statutory interpretation and apply them to the statutory provisions at issue. For reasons we proceed to explain, we conclude that L-meth is a restricted controlled substance as defined by the relevant statutes and that it is sufficient for the State to prove that Johnson had a detectable amount of methamphetamine in his blood for purposes of the statutes prohibiting operating a motor vehicle with a detectable amount of a restricted controlled substance in the blood.

### A. Applicable Standard of Review and Principles of Statutory Interpretation

¶21 The interpretation and application of statutes present questions of law that we review independently. ***Phelps v. Physicians Ins. Co. of Wis.***, 2009

11

WI 74, ¶36, 319 Wis. 2d 1, 768 N.W.2d 615. When interpreting a statute, we begin with its language. *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.*, ¶45. "Importantly, 'ascertaining the plain meaning of a statute requires more than focusing on a single sentence or portion thereof.'" *Brey v. State Farm Mut. Auto. Ins. Co.*, 2022 WI 7, ¶11, 400 Wis. 2d 417, 970 N.W.2d 1 (quoted source omitted). When deciding whether language is plain, courts must read the words in context and with a view to the place of those words in the overall statutory scheme. *Id.* In other words, "statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Kalal*, 271 Wis. 2d 633, ¶46. "Finally, when engaging in statutory interpretation, we are assisted by prior decisions that have examined the relevant statutes." *State v. Soto*, 2012 WI 93, ¶20, 343 Wis. 2d 43, 817 N.W.2d 848. "'If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning.'" *Kalal*, 271 Wis. 2d 633, ¶46 (quoting *Bruno v. Milwaukee County*, 2003 WI 28, ¶20, 260 Wis. 2d 633, 660 N.W.2d 656).

¶22 "[S]cope, context, and purpose are perfectly relevant to a plain-meaning interpretation of an unambiguous statute as long as the scope, context, and purpose are ascertainable from the text and structure of the statute itself, rather than extrinsic sources, such as legislative history." *Kalal*, 271 Wis. 2d 633, ¶48. But courts are prevented from using "extrinsic sources of interpretation to vary or contradict the plain meaning of a statute, ascertained by application of the

12

foregoing principles of interpretation." *Id.*, ¶51. We cannot "'tap[] legislative history to show that an unambiguous statute is ambiguous.'" *Id.* (quoting *Seider v. O'Connell*, 2000 WI 76, ¶51, 236 Wis. 2d 211, 612 N.W.2d 659).

¶23 "We will not read into the statute a limitation the plain language does not evidence." *County of Dane v. LIRC*, 2009 WI 9, ¶33, 315 Wis. 2d 293, 759 N.W.2d 571. *See also Dawson v. Town of Jackson*, 2011 WI 77, ¶42, 336 Wis. 2d 318, 801 N.W.2d 316 ("We decline to read into the statute words the legislature did not see fit to write.").

*B. Interpretation of WIS. STAT. §§ 340.01(50m), 939.22(33), and 967.055(1m)(b)*

¶24 We begin with the identical language of the three definitional statutes that apply to the charges against Johnson:

> "Restricted controlled substance" means any of the following:
>
> 1. A controlled substance included in schedule I under ch. 961 other than a tetrahydrocannabinol.
>
> 2. A controlled substance analog, as defined in s. 961.01 (4m), of a controlled substance described in subd. 1.
>
> 3. Cocaine or any of its metabolites.
>
> 4. Methamphetamine.
>
> 5. Delta-9-tetrahydrocannabinol, excluding its precursors or metabolites, at a concentration of one or more nanograms per milliliter of a person's blood.

WIS. STAT. §§ 340.01(50m), 939.22(33), and 967.055(1m)(b).[7]

¶25    As quoted, the three provisions define "restricted controlled substance" to include "[m]ethamphetamine."   WIS. STAT. §§ 340.01(50m)(d), 939.22(33)(d), and 967.055(1m)(b)4.   None of the provisions further define or limit "methamphetamine," and, as stated, Johnson does not dispute that, as an isomer of methamphetamine, L-meth *is* methamphetamine.   *See* n.1 above.   The statutes do not contain any language distinguishing the two isomers L-meth and D-meth either from "methamphetamine" or from each other.   The statutes do not contain any language that limits "methamphetamine" to only one isomer of methamphetamine or that excludes from "methamphetamine" one isomer of methamphetamine.   Thus, the statutory language unambiguously indicates that L-meth is included in the shared definition of "restricted controlled substance." *See Seider*, 236 Wis. 2d 211, ¶40 (creation of exceptions reserved to legislature); *LIRC*, 315 Wis. 2d 293, ¶33 (refusing to read in limitations not in plain language).

¶26    The two statutes under which Johnson was charged, WIS. STAT. §§ 346.63 and 940.09, support this plain language interpretation.   As stated, these statutes criminalize operating a motor vehicle when the "person has a detectable amount of a restricted controlled substance in [the person's] blood," causing injury or death, respectively.   Secs. 346.63(2)(a)3., 940.09(1)(am).   Each of these statutes also creates an affirmative defense in cases in which the defendant allegedly had a detectable amount of methamphetamine in the defendant's blood.   The affirmative defense is established if the defendant "proves by a preponderance of the evidence

---

[7] We clarify that the quoted language is identical in the three statutes, but that the statutes use different formatting and references, such as to "par." instead of "subd."   *See* WIS. STAT. §§ 340.01(50m), 939.22(33), and 967.055(1m)(b).   These non-substantive differences do not matter to our interpretation of the language shared by the three statutes.

that at the time of the incident or occurrence [the defendant] had a valid prescription for methamphetamine or one of its metabolic precursors." Secs. 346.63(2)(b)2., 940.09(2)(b). The affirmative defense does not distinguish between L-meth and D-meth; the defense is available for any defendant with a valid prescription for a medication that contains methamphetamine. The statutes contain no similar defense for those who consumed methamphetamine, regardless of the isomer, by any means other than through a valid prescription.

¶27 Johnson does not directly address the statutory language defining "restricted controlled substance." Instead, he argues that the statutory definitions are ambiguous, based on the definition of "controlled substance" in WIS. STAT. §§ 340.01(9m) and 961.01(4), and based on his assertion that L-meth is not a controlled substance under WIS. STAT. § 961.16 because it is an ingredient in over-the-counter nasal treatments or sprays. We now briefly summarize Johnson's argument further.

¶28 WISCONSIN STAT. § 340.01(9m) defines "controlled substance" as having the meaning given in WIS. STAT. § 961.01(4). Section 961.01(4) defines "controlled substance" as "a drug, substance or immediate precursor included in schedules I to V of subch. II." Methamphetamine, "including any of [its] … isomers," is a schedule II controlled substance. WIS. STAT. § 961.16(5)(b). However, according to Johnson, other provisions exclude the isomer L-meth as a controlled substance under schedule II because it is an ingredient in inhalers that can be sold over the counter without a prescription. Therefore, Johnson concludes, L-meth cannot be a restricted controlled substance because it is not a controlled substance. We reject this argument because the premise that L-meth is not a controlled substance rests on a misinterpretation of the relevant state and federal statutes and federal regulations.

15

¶29 Johnson cites WIS. STAT. § 961.11(6)(a), which states that "[t]he controlled substances board shall not have authority to control a nonnarcotic substance if the substance may, under the federal food, drug and cosmetic act and the laws of this state, be lawfully sold over the counter without a prescription." We do not need to address whether this provision describing the authority of the controlled substances board "to control a … substance" is intended to affect the legislature's authority to prohibit, under the motor vehicle and criminal codes, driving with a detectable amount of methamphetamine as a restricted controlled substance under a separate definitional scheme. Assuming without deciding that the legislature lacks this authority, federal law does not exclude L-meth as a controlled substance.

¶30 Title 21 U.S.C. § 811(g)(1) states that the United States "Attorney General shall by regulation exclude any non-narcotic drug which contains a controlled substance from the application of [subchapters I and II of the Drug Abuse Prevention and Control chapter] if such drug may, under the Federal Food, Drug, and Cosmetic Act, be lawfully sold over the counter without a prescription." Pursuant to this provision, the federal Drug Enforcement Administration promulgated a rule, codified at 21 C.F.R. § 1308.22. This rule provides that "[t]he following nonnarcotic substances[,] which may, under the Federal Food, Drug, and Cosmetic Act…, be lawfully sold over the counter without a prescription, are excluded from all schedules pursuant to [21 U.S.C. § 811(g)(1)]." Included in 21 C.F.R. § 1308.22 is a table titled "Excluded Nonnarcotic Products," a portion of which we now reproduce:

16

| Company | Trade name | NDC code | Form | Controlled substance | (mg or mg/ml) |
|---|---|---|---|---|---|
| Aphena Pharma Solutions— New York, LLC | Nasal Decongestant Inhaler/Vapor Inhaler | | IN | Levmetamfetamine (l-Desoxyephedrine) | 50.00 |
| Procter & Gamble Co., The | Vicks VapoInhaler | 37000-686-01 | IN | Levmetamfetamine (l-Desoxyephedrine) | 50.00 |

¶31    Summing up, the unambiguous language of these statutes and regulation directs that what is excluded from the schedules is the nonnarcotic "drug" or "product," not the controlled substance *contained in* that drug. First, 21 U.S.C. § 811(1)(g) instructs the Attorney General to exclude any non-narcotic drug "which contains a controlled substance," suggesting that the substance contained within that drug remains a controlled substance. Second, the table in 21 C.F.R. § 1308.22 listing the excluded products identifies specific products that are excluded and includes a column for the particular "controlled substance" that is contained in that product. If L-meth itself were excluded from all schedules, there would be no need to list two different products containing L-meth; instead, the table would simply list L-meth.

¶32    Additionally, we consider it persuasive that all four federal circuit courts of appeal to consider the issue have concluded that the regulation excludes only the specific products containing methamphetamine in a specified quantity,

17

without suggesting that methamphetamine itself is not a controlled substance.  *See United States v. Walker*, 960 F.2d 409, 414 (5th Cir. 1992) ("The controlled substances listed in the chart [in 21 C.F.R. § 1308.22] were not descheduled altogether; they were descheduled only in the form of Rynal Spray and Vicks Inhaler."); *United States v. Youngblood*, 949 F.2d 1065, 1066 (10th Cir. 1991) ("[O]ther uses or combinations of methamphetamine[] or its isomers [beyond the Vicks and other inhalers specifically excepted by 21 C.F.R. § 1308.22] remain controlled substances under Schedule II…."); *United States v. Durham*, 941 F.2d 886, 889-90 (9th Cir. 1991) ("Rynal Spray and Vicks Inhaler … contain methamphetamine or a derivative as a part of a combination of ingredients and in such amounts as to be much less likely to be abused, thus enabling the substance to be used for its medicinal values.  The functional difference between methamphetamine itself and the non-narcotic compounds containing methamphetamine as an ingredient is clear and is the basis of the different treatment they are accorded by the regulations.  The mere inclusion of a controlled substance as an ingredient in a nonnarcotic nonprescription drug does not alter its status under the Controlled Substances Act."); *United States v. Roark*, 924 F.2d 1426, 1428 n.2 (8th Cir. 1991) ("The exclusion, under 21 C.F.R. 1308.22, of the Vicks Inhaler from the Schedule is distinct from an exclusion of methamphetamine itself from Schedule II….  The FDA has … approved the combination of ingredients that appears in the Vicks Inhaler….  The exclusion of the Vicks Inhaler, therefore, is a 'specific exception.'  Other uses of methamphetamine or its isomers, unless specifically excepted, remain controlled substances under Schedule II.").

¶33    Providing further support for this interpretation, supplementary information published in the Federal Register in connection with amendments to

21 C.F.R. § 1308.22 consistently makes clear that L-meth is a controlled substance under the federal Controlled Substances Act and that only a specific product containing not more than a specified concentration of L-meth is excluded from the schedules. *See, e.g.*, Schedules of Controlled Substances: Table of Excluded Nonnarcotic Products: Nasal Decongestant Inhaler/Vapor Inhaler, 81 Fed. Reg. 6453 n.1 (Feb. 8, 2016) ("Levmetamfetamine [L-meth] is controlled in schedule II of the CSA because it is an isomer of methamphetamine."); Schedules of Controlled Substances: Table of Excluded Nonnarcotic Products: Nasal Decongestant Inhalers Manufactured by Classic Pharmaceuticals LLC, 74 Fed. Reg. 44,282-83 (Aug. 28, 2009) ("Note that this exclusion only applies to the finished drug product in the form of an inhaler…, which is lawfully sold under the Federal Food, Drug, and Cosmetic Act. The extraction or removal of the active ingredient (Levmetamfetamine [L-meth]) from the inhaler shall negate this exclusion and result in the possession of a schedule II controlled substance.").

¶34 In sum on this point, we conclude that L-meth remains a controlled substance in schedule II of Wisconsin's controlled substances act, because only the specific combination of substances in the excluded non-narcotic drug products are lawfully sold over the counter, not L-meth itself. *See* WIS. STAT. § 961.11(6)(a) (withholding authority to control nonnarcotic substances lawfully sold over-the-counter under the federal food, drug and cosmetic act). Each specific product gets a pass in its specific role as a product, but that does not change the general legal status of methamphetamine in Wisconsin.

¶35 Johnson essentially argues that it would be absurd "to prohibit driving with a detectable amount of any form of methamphetamine," allowing a potential affirmative defense for consuming methamphetamine pursuant to a valid prescription, but not allowing a defense for using over-the-counter products

containing methamphetamine, such as inhalers. However, this is a challenge to policy positions of the legislature that fall outside the purview of the courts. *See State v. Wiedmeyer*, 2016 WI App 46, ¶13, 370 Wis. 2d 187, 881 N.W.2d 805 ("It is not up to the courts to rewrite the plain words of statutes to further the public policy goals the legislature hopes to accomplish. Designing a statutory scheme that accomplishes its goals is up to the legislature. Whether they do that well or not … is immaterial to the limited judicial task of saying what the law is.").

¶36 Moreover, consistent with another statute closely related to the definitional and enforcement statutes at issue, *see* n.6 above, we can discern potential rationales that are not absurd that would provide a basis for the legislature to choose not to include a defense for persons allegedly consuming L-meth via over-the-counter nasal inhalers. WISCONSIN STAT. § 967.055(1)(a), located within the criminal procedure code, details the legislative purpose behind certain motor vehicle offenses: "The legislature intends to encourage the vigorous prosecution of … offenses concerning the operation of motor vehicles by persons with a detectable amount of a restricted controlled substance in [their] blood…." *See also Kalal*, 271 Wis. 2d 633, ¶48 (permitting reference to purpose found in the text of the statute absent finding of ambiguity); WIS. STAT. § 967.055(1m)(b) (defining restricted controlled substance). The current testing capabilities of the Hygiene Laboratory do not allow the laboratory to distinguish between the two isomers of methamphetamine, so blood test results merely show the presence of methamphetamine, not differentiated by isomer or any other characteristic. Further, the legislature could logically reason that a valid prescription for methamphetamine that was obtained by the driver before a vehicle crash—something obtained only through at least some degree of effort—will at least on average stand as far better proof of actual legitimate use than the too-easy-to-claim

20

assertion that the driver had made a pre-crash purchase of an over-the-counter product.

¶37 In other words, the legislature could logically have concluded that, in light of the Hygiene Laboratory's inability to distinguish between the two isomers, allowing an affirmative defense for individuals who allege they have consumed over-the-counter methamphetamine would contravene the textually manifest intent to "vigorous[ly] prosecut[e] … offenses concerning the operation of motor vehicles by persons with a detectable amount of a restricted controlled substance in [their] blood." *See* WIS. STAT. § 967.055(1)(a). The legislature could logically have concluded that creating an affirmative defense only for prescribed methamphetamine would better serve the intent to prioritize road safety when the detection of methamphetamine in the blood cannot be justified by a valid prescription.

¶38 Johnson also argues that the legislative history makes clear that the statutes defining methamphetamine as a restricted controlled substance were not intended to include L-meth. Because we conclude that the statutes are unambiguous, we do not examine the legislative history. *See Kalal*, 271 Wis. 2d 633, ¶51 ("We have repeatedly emphasized that 'traditionally, resort to legislative history is not appropriate in the absence of a finding of ambiguity.'" (quoted sources omitted)).

### III. Constitutionality

¶39 We now turn to Johnson's argument that the definitional statutes, WIS. STAT. §§ 340.01(50m), 939.22(33), and 967.055(1m)(b), together with the enforcement statutes, WIS. STAT §§ 346.63(2)(a)3. and 940.09(1)(am), are unconstitutional insofar as those statutes include L-meth in the definition of

21

restricted controlled substance, because criminalizing driving with L-meth in the blood violates due process and equal protection. Specifically, Johnson asserts that there is no rational basis "for imposing criminal liability for operating a motor vehicle with a detectable but not impairing amount of a perfectly legal substance such as [L]-meth but failing to do so with respect to many other over the counter substances."[8]

¶40 While Johnson styles his argument as an as-applied constitutional challenge, the substance of his argument challenges the facial constitutionality of the statutes to the extent that they include L-meth as a restricted controlled substance. This court reviews facial constitutional challenges de novo. *Mayo v. Wisconsin Injured Patients and Fams. Comp. Fund*, 2018 WI 78, ¶23, 383 Wis. 2d 1, 914 N.W.2d 678. We presume that statutes are constitutional. *State v. Luedtke*, 2015 WI 42, ¶75, 362 Wis. 2d 1, 863 N.W.2d 592. "Thus, we 'indulge[] every presumption to sustain the law if at all possible, and if any doubt exists about a statute's constitutionality, we must resolve that doubt in favor of constitutionality.'" *Id.* (quoted source omitted). The party arguing that a statute is unconstitutional "has the burden to prove the statute's unconstitutionality beyond a reasonable doubt." *Id.*

¶41 When addressing due process and equal protection challenges, Wisconsin courts apply one of two levels of scrutiny. *Mayo*, 383 Wis. 2d 1, ¶28. Strict scrutiny applies when statutes restrict a fundamental right or regulate a

---

[8] Johnson asks us to remand the matter to the circuit court to decide the constitutionality issue in the first instance, arguing that we should not reach the issue. But Johnson provides no legal support for his arguments and, accordingly, we do not address them further. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) ("Arguments unsupported by references to legal authority will not be considered.").

protected class. *Id.* "When strict scrutiny is applied, the statute must serve a compelling state interest; the statute must be necessary to serving that interest; and the statute must be narrowly tailored toward furthering that compelling state interest." *Id.* Rational basis scrutiny applies when no fundamental right or protected class is at issue. *Id.*, ¶29.

¶42 The parties agree that no fundamental right is implicated here. Johnson hints at the notion that the statutes regulate one or more protected classes, but he does not develop this assertion with cites to the record or supporting legal authority, and we reject his conclusory and unsupported assertion on that basis. *See Associates Fin. Servs. Co. of Wis. v. Brown*, 2002 WI App 300, ¶4 n.3, 258 Wis. 2d 915, 656 N.W.2d 56 (this court may decline to consider conclusory and undeveloped arguments that are inadequately briefed). Accordingly, we apply rational basis scrutiny. *See Luedtke*, 362 Wis. 2d 1, ¶76 (applying rational basis when a statute does not implicate a fundamental right or protected class).

¶43 When applying rational basis scrutiny, we will uphold the statute as constitutional "'unless it is patently arbitrary and bears no rational relationship to a legitimate government interest.'" *State v. Smith*, 2010 WI 16, ¶12, 323 Wis. 2d 377, 780 N.W.2d 90 (quoted sources omitted). The rational relationship and governmental interest "'need not be expressly stated by the legislature; if the court can conceive of facts on which the legislation could reasonably be based, it must uphold the legislation as constitutional.'" *State v. Quintana*, 2008 WI 33, ¶77, 308 Wis. 2d 615, 748 N.W.2d 447 (quoted source omitted).

¶44 We address Johnson's due process and equal protection arguments in turn.

### A. Substantive Due Process

¶45     The due process clause of the United States Constitution provides: "No state shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Our supreme court has held that the due process clause of the Wisconsin Constitution is substantially equivalent to the Fourteenth Amendment due process clause of the United States Constitution. *State ex rel. Cresci v. Schmidt*, 62 Wis. 2d 400, 414, 215 N.W.2d 361 (1974). "'The touchstone of due process is protection of the individual against arbitrary action of government.'" *Mayo*, 383 Wis. 2d 1, ¶38 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)).

¶46     Johnson argues that a prohibition against having a detectable but non-impairing amount of L-meth, what he characterizes as a "perfectly legal substance," in the blood while driving for purposes of prosecution under the Wisconsin motor vehicle code and criminal code violates due process. Johnson provides no record support for his implied assertion that it is possible to have a "detectable but not impairing" amount of L-meth in the blood. Indeed, Johnson acknowledges that studies have shown that L-meth may be impairing, at least at high doses. In any case, we reject his argument based on a lack of record evidence on this issue. *See Jensen v. McPherson*, 2004 WI App 145, ¶6 n.4, 275 Wis. 2d 604, 685 N.W.2d 603 ("It is not this court's responsibility to sift and glean the record in extenso to find facts supporting [the party's] argument."); *State v. McMorris*, 2007 WI App 231, ¶30, 306 Wis. 2d 79, 742 N.W.2d 322 (this court "may choose not to consider … arguments that lack proper citations to the record."). In addition, we also briefly explain why his argument, even if supported, fails the rational basis test.

24

¶47　The government has a legitimate interest in public safety and, more specifically, roadway safety and preventing drugged driving. *Luedtke*, 362 Wis. 2d 1, ¶77; *State v. VanderGalien*, 2024 WI App 4, ¶27, 410 Wis. 2d 517, 2 N.W.3d 774 (2023). The legislature could have reasonably concluded that this interest is served by prohibiting driving with a detectable amount of any form of methamphetamine in the blood, based on the demonstrated danger of driving with D-meth in the blood in combination with the Hygiene Laboratory's inability to distinguish between L-meth and D-meth. If the legislature excluded L-meth from the definition of restricted controlled substance, it would be significantly more difficult to prosecute those driving with D-meth in their blood. For all of these reasons, the legislature could also have reasonably concluded that prohibiting driving with a detectable amount of any form of methamphetamine in the blood, regardless of whether the form of methamphetamine is L-meth or D-meth, would improve roadway safety and facilitate the prosecution of drugged driving by allowing the State to pursue prosecutions based on a positive test result for methamphetamine. The statutes prohibiting driving with a detectable amount of any form of methamphetamine in the blood "bear[] [a] rational relationship to [the] legitimate government interest" in roadway safety and preventing drugged driving. *See Smith*, 323 Wis. 2d 377, ¶12.

¶48　Johnson also argues that it would be "fundamentally unfair for the government to allow the sale, purchase and use of [L]-meth without a prescription, but then punish that conduct if it is combined with driving, regardless of impairment." However, this argument fails under the same rational basis analysis undertaken above.

¶49　In sum on this issue, Johnson has not proven beyond a reasonable doubt that prohibiting driving with any form of methamphetamine in the blood is

arbitrary or irrational. Accordingly, he fails to show that the statutes violate due process.

### B. Equal Protection

¶50 "The equal protection clause requires that the legislature have reasonable and practical grounds for the classifications that it draws." *Quintana*, 308 Wis. 2d 615, ¶79. "[T]he state retains broad discretion to create classifications so long as the classifications have a reasonable basis." *State v. McManus*, 152 Wis. 2d 113, 131, 447 N.W.2d 654 (1989). To prevail on an equal protection challenge, Johnson "must show that the statute[s] 'treat[] members of similarly situated classes differently.'" *Mayo*, 383 Wis. 2d 1, ¶37 (quoted source omitted).

¶51 Johnson argues that classifying L-meth as a restricted controlled substance while not classifying dextromethorphan ("DXM"), an ingredient found in some over-the-counter cough medicine, as a restricted controlled substance lacks a reasonable basis. This is because, according to Johnson, "DXM, like [L]-meth, is present in legal, over the counter medication and may, when taken to intoxication, cause impairment and negative effects in driving users." Specifically, Johnson argues that the statutes treat the class of people who have sinus congestion and use over-the-counter products containing L-meth to treat that condition, and the class of people who have a cough and use over-the-counter products containing DXM to treat that condition, "very differently," and that there is no reasonable basis to do so.

¶52 We reject this argument for at least the reason that L-meth differs significantly from DXM because L-meth is indistinguishable from D-meth under the Hygiene Laboratory's existing testing capabilities. For the same reasons

26

explained in our due process analysis above, the legislature had a reasonable basis to prohibit driving with a detectable amount of methamphetamine, regardless of whether it is L-meth or D-meth, in the blood, while not doing the same for DXM, namely, to make it easier to deter and prosecute driving with a detectable amount of D-meth in the blood. Moreover, Johnson does not provide any evidence that L-meth and DXM are similarly impairing, making it impossible to conclude that users of the two substances are similarly situated. Therefore, he has not proven beyond a reasonable doubt that the classification is arbitrary.

¶53 In sum on this issue, we conclude that Johnson fails to show that the challenged statutes are unconstitutional.

## CONCLUSION

¶54 For the reasons set forth above, we reverse that part of the circuit court's order stating that L-meth is not a restricted controlled substance, that the State is required to prove that Johnson had a detectable amount of D-meth in his blood, and that it is insufficient for the State to prove only that Johnson had a detectable amount of methamphetamine in his blood. We reverse the order in part and remand to the circuit court for further proceedings consistent with this opinion.

*By the Court.*—Order reversed in part; cause remanded for further proceedings.

Recommended for publication in the official reports.